907 A.2d 255

**Elinor WALKER**

v.

**Ronald GROW.**

**No. 2613, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 12, 2006.

258

260

Jonathan Isaacs, Rockville, for appellant.

Neal Meiselman (Nogah B. Helfant, Terry M. Shuch, on brief), Rockville, for appellee.

Panel EYLER, JAMES R., KENNEY, and KRAUSER, JJ.

## ON MOTION FOR RECONSIDERATION

KENNEY, J.

Appellant, Elinor Walker, appeals the modification of the child support obligation of appellee, Ronald Grow, and the denial of attorney's fees by the Circuit Court for Montgomery County. She presents four questions, which we have reordered as follows:

1. Was the trial court's decision to disregard aspects of appellee[']s income for the purposes of calculating child support, including funds distributed to appellee through his corporation, error and an abuse of discretion?

2. Did the trial court err or abuse its discretion in failing to include work-related child care expenses and extraordinary monthly medical expenses when modifying child support in this matter?

■ Was it [an] abuse of discretion to order child support at an amount insufficient to provide the minor children with the material advantages enjoyed by appellee?

■ Did the trial court err in failing to grant appellant's request for attorney fees?

For the following reasons, we shall vacate the circuit court's judgment.[1]

## FACTUAL AND PROCEDURAL HISTORY

The parties, who have never been married, have two minor children together—fifteen year old Noah and twelve year old

---

1. Our opinion was filed on June 29, 2006. Motions for reconsideration were filed by both parties, resulting in modification of certain language within the opinion.

Hope. They have engaged in several child support disputes over the years, the last of which resulted in a consent order dated November 14, 1995. According to the order, the parties agreed to child support payments by Grow in "the sum of $925 per month, plus 75% of the cost of the minor children's day care."

On May 7, 2004, Walker moved for a modification of child support, alleging that the children's expenses had increased, and that Grow's income had increased. Walker requested that the court "recalculate child support on the basis of an 'above Guidelines' analysis of the joint income of the parties, the minor children's expenses and other related factors." Additionally, Walker requested attorney's fees. The court held a hearing on December 7–8, 2004.

Grow is the chief operating officer of Aliron International, Inc. ("Aliron"), and a shareholder in the company. According to Grow's 2003 federal income tax return, his adjusted gross income was $272,835. In his financial statement to the court, Grow listed his gross monthly wages at $12,499.06 ($149,988.72 per year). At trial, he was examined and cross-examined extensively on his expenditures, investments, and the perquisites of his employment. Grow testified that he has vacationed abroad in the last five years, pays a housekeeper, has had cosmetic surgery, makes $5,000 monthly payments on "a piece of artwork," has a gym membership, and drives a Mercedes Benz. He has provided financial assistance to his mother in dealing with her ownership of real property, and was paid a fee for management of his mother's property. He owns various mutual funds, stocks, and real property in Maryland, Florida, and Costa Rica, including a 30 percent ownership interest in Aliron's office building. His company provides his health insurance, pays for his cellular phone, and pays his expenses for overseas business trips.

Gabrielle Kaufman, the accountant for Aliron and Grow, testified that Aliron is a Subchapter S corporation. Grow is the minority shareholder, owning thirty percent, and Cora Alisuag, the president and chief executive officer, is the major-

ity shareholder, owning the remaining seventy percent. Alisuag has the "ultimate authority" as to all business decisions, including "total discretion" with regard to distributions. Kaufman described Aliron's financial structure, and testified to Grow's income from the business.

Walker testified that she is employed as an attorney for the County in the "Pro Se Project." On her financial statement, she listed her gross monthly wages as $4,162. She testified to various expenses associated with her home, and the costs of raising the children.

The court found Walker's monthly actual income to be $4,165, and Grow's to be $12,442, for a combined adjusted actual income of $16,607. That amount exceeds the highest figure in the statutory schedule of basic child support obligations. In such a case, the court has discretion in setting the amount of child support. The court reasoned: "After listening to all the testimony and arguments of counsel I view this as, really, a guidelines case. . . . I think this case, actually, in my view, proves the wisdom of using the guidelines in most circumstances." Extrapolating from the statutory schedule, the court determined that Grow's support obligation would be $1,609 per month, and denied Walker's request for counsel fees. The court issued an order to that effect on December 21, 2004, which was entered on the docket on December 28, 2004. On January 7, 2004, Walker moved to vacate or, alternatively, to alter, amend, or revise the order. On January 25, 2005, she noted this timely appeal. The circuit court denied Walker's motion on February 14, 2005.

## DISCUSSION

■■■■ "The parents of a child are his natural guardians and, quite apart from the moral obligations of parenthood, owe the child a legal, statutory obligation of support." *Lacy v. Arvin*, 140 Md.App. 412, 422, 780 A.2d 1180 (2001). "A parent owes this obligation . . . to the child regardless of whether the child was the product of a marriage." *Id.* "The court may modify a child support award subsequent to the filing of a

motion for modification and upon a showing of a material change of circumstance." Md.Code (1984, 2004 Repl.Vol.), § 12–104(a) of the Family Law Article ("Fam.Law").

If the combined adjusted actual income of the parents is $10,000 per month or less, the court must calculate the proper amount of child support using the statutory child support guidelines. Fam. Law § 12–202; *Johnson v. Johnson*, 152 Md.App. 609, 614, 833 A.2d 46 (2003). When the combined adjusted actual monthly income is over $10,000, "the court may use its discretion in setting the amount of child support." Fam. Law § 12–204(d). *See also Johnson*, 152 Md.App. at 614, 833 A.2d 46. "Several factors are relevant in setting child support in an above Guidelines case. They include the parties' financial circumstances, the 'reasonable expenses of the child,' and the parties' 'station in life, their age and physical condition, and expenses in educating the child[ ].' " *Freeman*, 149 Md.App. at 20, 814 A.2d 65 (quoting *Voishan v. Palma*, 327 Md. 318, 329, 332, 609 A.2d 319 (1992)). "Nevertheless, in above Guidelines cases, calling for the exercise of discretion, the rationale of the Guidelines still applies." *Malin v. Mininberg*, 153 Md.App. 358, 410–11, 837 A.2d 178 (2003). Here, the court calculated the amount of child support by extending the scheduled support to a combined actual income of $16,607 per month.

"Child support orders ordinarily are within the sound discretion of the trial court." *Shenk v. Shenk*, 159 Md.App. 548, 554, 860 A.2d 408 (2004). Likewise, "the question of whether to modify an award of child support 'is left to the sound discretion of the trial court, so long as the discretion was not arbitrarily used or based on incorrect legal principles.' " *Tucker v. Tucker*, 156 Md.App. 484, 492, 847 A.2d 486 (2004) (quoting *Smith v. Freeman*, 149 Md.App. 1, 21, 814 A.2d 65 (2002)).

"[W]here the order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review." *Child Support*

*Enforcement Admin. v. Shehan,* 148 Md.App. 550, 556, 813 A.2d 334 (2002).

## I. *Grow's Actual Income*

Walker argues first that the circuit court erred in computing Grow's actual income by failing to include in the computation "pass-through" corporate income appearing on Grow's income tax return. She also argues that the court erred in failing to include other income in its calculation.

■■■■ "When the chancellor exercises discretion with respect to child support in an above Guidelines case, he or she 'must balance the best interests and needs of the child with the parents' financial ability to meet those needs.' " *Freeman,* 149 Md.App. at 20, 814 A.2d 65 (quoting *Unkle v. Unkle,* 305 Md. 587, 597, 505 A.2d 849 (1986)). "[T]he parties' financial circumstances" is among the relevant factors the trial court must consider. *Freeman,* 149 Md.App. at 20, 814 A.2d 65. Indeed, " 'the central factual issue is the "actual adjusted income" of each party.' " *Johnson,* 152 Md.App. at 615, 833 A.2d 46 (quoting *Reuter v. Reuter,* 102 Md.App. 212, 221, 649 A.2d 24 (1994)). Accordingly, even in a case in which the statutory schedule of basic child support obligations does not apply, the trial court must ascertain each parent's "actual income." Fam. Law § 12–204(d) (providing for the court's use of "discretion in setting the amount of child support" when the "combined adjusted actual income exceeds the highest level specified in the schedule"); *Johnson,* 152 Md.App. at 615–22, 833 A.2d 46 (using the statutory definition of "actual income" to determine that a "bonus" received by the obligor should be included in the calculation, which caused the combined income to exceed $10,000).

" 'Actual income' means income from any source." Fam. Law § 12–201(b)(1). "For income from self-employment, rent, royalties, proprietorship of a business, or joint ownership of a partnership or closely held corporation, 'actual income' means gross receipts minus ordinary and necessary expenses re-

quired to produce income." Fam. Law § 12–201(b)(2). According to the statute:

(3) "Actual income" includes:

(i) salaries;

(ii) wages;

(iii) commissions;

(iv) bonuses;

(v) dividend income;

(vi) pension income;

(vii) interest income;

(viii) trust income;

(ix) annuity income;

(x) Social Security benefits;

(xi) workers' compensation benefits;

(xii) unemployment insurance benefits;

(xiii) disability insurance benefits;

(xiv) for the obligor, any third party payment paid to or for a minor child as a result of the obligor's disability, retirement, or other compensable claim;

(xv) alimony or maintenance received; and

(xvi) expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business to the extent the reimbursements or payments reduce the parent's personal living expenses.

(4) Based on the circumstances of the case, the court may consider the following items as actual income:

(i) severance pay;

(ii) capital gains;

(iii) gifts; or

(iv) prizes.

(5) "Actual income" does not include benefits received from means-tested public assistance programs, including temporary cash assistance, Supplemental Security Income, food

stamps, and transitional emergency, medical, and housing assistance.

Fam. Law § 12–201(b)(3)–(5).

The court must verify the parents' income statements "with documentation of both current and past actual income." Fam. Law § 12–203(b)(1). "[S]uitable documentation of actual income includes pay stubs, employer statements otherwise admissible under the rules of evidence, or receipts and expenses if self-employed, and copies of each parent's 3 most recent federal tax returns." Fam. Law § 12–203(b)(2)(i). In the case of a parent who is self-employed, "the court may require that parent to provide copies of federal tax returns for the 5 most recent years." Fam. Law § 12–203(b)(2)(ii).

## A. S Corporation Pass–Through Income and Distributions

According to Grow's federal income tax return for 2003, his taxable income was $277,175. His 2002 and 2001 returns show taxable incomes of $174,751 and $249,148 respectively. In the financial statement presented to the court, however, Grow indicated that his "gross monthly wages" were $12,360.25, or $148,323 per year.

Gabriele Kaufman, Grow's and Aliron's accountant, testified that, because Aliron is a Subchapter S corporation, Grow's federal income tax returns do not reflect his actual income. Rather, "[the] income of the business is flowed through to the shareholders and reported on the shareholder's personal tax returns, and the taxes associated with that income [are] paid by the shareholders." She testified that the income shown on the shareholders' tax returns "doesn't necessarily at all mean that they receive any of that income." Kaufman explained that Grow did not "technically receive the income that was reported" on his tax returns:

> He doesn't receive that income because first and foremost Mr. Grow is a minority shareholder of Aliron, and he has no, he has no rights to force the corporation to make distribu-

tions. The majority shareholder has full discretion as to when and if distributions will be made.

\* \* \*

And the second reason, which is another kind of major reason, is that the business needs to retain cash in the company in order for it to fund its ordinary and necessary expenses of the business, its operations, pay its payroll, pay its bills.

Grow entered into evidence a 1040 tax return on which Kaufman had calculated his income without the pass-through income that was retained by Aliron, used to pay the company's taxes, or distributed for business purposes, in addition to his 2003 schedule K–1, which shows his "Shareholder's Share of Income, Credits, Deductions, etc." Kaufman testified that, in calculating Grow's income without the corporate pass-through income, she subtracted the amount that appeared on the K–1 as "Ordinary income (loss) from trade or business activities" and on line 17 of Grow's 1040, "Rental real estate, royalties, partnerships, S corporations, trusts, etc." Kaufman also subtracted the amount that was reported on the K–1 as "Investment income," "Tax-exempt interest income," "Charitable contributions," and "Section 179 expense deduction." She also subtracted the amount listed on the K–1 under "Property distributions (including cash)." According to Kaufman, "most of [the distributions] relate to quarterly estimated tax payments that have to be made on the profits of this year's income," and "it might also be some distributions relating to some business investments that they made for the business." Kaufman calculated Grow's income as $149,359. Asked by counsel whether, "within a reasonable degree of accuracy," that figure represents the actual amount of Grow's income, Kaufman responded in the affirmative.

At the conclusion of her testimony, the court asked Kaufman to make the calculation on the stand:

THE COURT: Ordinarily [if] somebody else, whether a private individual or a corporate individual pays your taxes, that's income to you, isn't it?

[KAUFMAN]: In a general sense when another party pays for your expenses, yes.

THE COURT: Well, it could be a gift but I mean in a business situation.

[KAUFMAN]: But with an S Corporation, it's different.

THE COURT: Why?

[KAUFMAN]: Because the whole purpose of being an S Corporation is to avoid double taxation.... And the reason is because S Corporations have special rules with double taxation, and they don't, it's a vehicle, it's an entity choice that allows you not to pay tax twice on the same income. It's more tax efficient than a regular corporation.

* * *

THE COURT: Could you look at [Grow's 2003 tax return] please? Looking at that return, which you prepared from information given to you by Mr. Grow, correct?

[KAUFMAN]: Yes.

THE COURT: Tell me, and if you need a calculator, I have one here.... What's this man's income for 2003, actual income? What do we look at as his income for 2003 based upon that return? Because at one point as you can see [his] adjusted gross income is 272. And when you came up with his [income] without Aliron it's 149. And what he told me was it's 148. So what's his actual income?

* * *

THE COURT: [Based on the tax return] he filed with the feds after you prepared it. Just looking at that, what should I regard as this man's income for 2003?

[KAUFMAN]: It should be, well, I need a calculator.

THE COURT: I'm pleased to see you need one.

[KAUFMAN]: It's really to be, to be really straight with you, that's why we use computers. It's not really possible for me on a calculator to come [to] exactly what his taxable income but—

THE COURT: Well, is it 148 or is [it] 272?

[KAUFMAN]: If we just go by, I'll make it easy. We'll go by adjusted gross income. Let me do it that way. It should come out to about 149,359 that I've come up with.

THE COURT: It should.

[KAUFMAN]: Yeah.

THE COURT: Does it?

[KAUFMAN]: Yeah. Let me do it again because I messed up on your calculator. I'm a few hundred dollars off but—

THE COURT: How much?

[KAUFMAN]: A few hundred dollars off.

THE COURT: So it's—

[KAUFMAN]: But that's because I'm not spending, I feel pressured with the time to not look for what my difference is. Oh, I know, I know what it might be. I see it. It's going to come out exact. It's the state refunds.

THE COURT: So how much is it? What's your number?

[KAUFMAN]: Okay. Let me just. I just keep adding wrong numbers but it's, it's about 150,000, 149,000.

THE COURT: Now, you're an accountant—

[KAUFMAN]: I'm feeling pressure on a calculator here. If you would let me, if you want to wait a few minutes, I'll do it.

THE COURT: I'd like to know since you did the return, I'd like to take that few minutes—

[KAUFMAN]: All right, good.

THE COURT:—and have you give me a definitive number and not a range, please.

\* \* \*

[KAUFMAN]: 149,359.

Asked on cross-examination how she arrived at the figure, Kaufman explained:

What I did was I took the adjusted gross income of 272,835 that was on his actual tax return. I subtracted out the 120,896 which was one component of the K–1 which was on line 17. I subtracted the interest income related to the

business of 1,760. That gave me 150,179. I subtracted out the difference in line 10, which is the state income tax refunds because some of that relates to the business and some of that is his personal tax refund. So I subtracted out that difference of $606. And because his income without Aliron is a little bit, slightly less than $150,000, he gets a small $214 loss from his rental property. So to add that back, that gives me the 149,359.

The court ultimately found that Grow's income was slightly less than the amount testified to by Kaufman:

. . . I'm looking at [Walker's] income on a monthly basis of being 4165, and [Grow's] being 12442[,] which is a little different from what Ms. Kauffman [sic] said. She told me yesterday his income was, for 2003, was 149,359. That's about 12446 a month. In fact, in his financial statement he says 12499. But after—not that I don't believe any other witness, but I, after I sort of pressed her and sort of made her do what I thought an accountant could do, not that she was unwilling, just felt uncomfortable, that the 4165 for the mom, 12442 for him seems accurate.

After the court announced its findings, Walker's counsel argued that the court should have included, among other things, a distribution from Aliron and interest on investments in its calculation of Grow's actual income. The court responded: "See, that doesn't get me anywhere. . . . That's business. . . . I don't see that as being something I can turn into income. . . ." The court based its child support award on its determination that Grow's actual income is $12,442 per month, or $149,304 per year.

### 1. The Court's Reliance on Expert Testimony

■ Walker contends that the circuit court erred in accepting the testimony of Kaufman in determining Grow's income. She argues that Kaufman acknowledged her lack of familiarity with the statutory definition of "actual income," and that the court relied too heavily on her calculation.

A court may admit expert testimony, "in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." Md. Rule 5–702. In *Gallagher v. Gallagher,* 118 Md.App. 567, 703 A.2d 850 (1997), a divorce and alimony case, we indicated that admitting the expert testimony of a certified public accountant to assist in determining the husband's income was appropriate. The expert testified that the husband, who was a professional gambler, received more income than he had reported. Although the husband had failed to preserve the issue for appeal, we noted:

> The numerous, complex, financial transactions in which appellant was involved required that an expert, such as a Certified Public Accountant, be consulted in order to determine the nature and extent of appellant's income and expenditures. It is clear that [the CPA] testified as to appellant's income and expenditures and traced certain assets held in various bank accounts. He also took certain statements and income tax records and drew from them conclusions. This is precisely what experts do.... Accordingly, we believe [the CPA] properly testified as an expert.

*Id.* at 578–79, 703 A.2d 850.

In this case, the court was presented with a somewhat complex business and personal financial picture. The court found that Kaufman was qualified as a certified public accountant and an expert on tax planning and consulting for closely held corporations. Moreover, although an expert need not testify from personal knowledge, Kaufman did, in fact, prepare the tax returns that were the subject of her testimony. Moreover, Walker did not attempt voir dire prior to Kaufman's testimony or object to her admission as an expert witness.

Walker cites *Ley v. Forman,* 144 Md.App. 658, 670, 800 A.2d 1 (2002), for this Court's statement: "The clear intention of the legislature requires the trial court to consider actual income and expenses based on the evidence. The court must rely on the verifiable incomes of the parties, and failure to do

so results in an inaccurate financial picture." Kaufman did not testify as to Grow's "actual income" under Fam. Law § 12–201(b). Indeed, she acknowledged that she was unfamiliar with the statutory definition of "actual income." Rather, she explained that the income shown on Grow's tax return is greater than the amount he actually received, and gave her opinion as to what that amount was. In other words, she "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue." Md. Rule 5–702. The court did not err in admitting her as an expert witness.

 Even if a witness is qualified as an expert, the fact finder need not accept the expert's opinion. To the contrary, " 'an expert's opinion is of no greater probative value than the soundness of his [or her] reasons given therefor will warrant.' " *Surkovich v. Doub,* 258 Md. 263, 272, 265 A.2d 447 (1970) (quoting *Miller v. Abrahams,* 239 Md. 263, 273, 211 A.2d 309 (1965)). The weight to be given the expert's testimony is a question for the fact finder. "The trier of fact may believe or disbelieve, accredit or disregard, any evidence introduced. We may not—and obviously could not—decide upon an appeal how much weight must be given, as a minimum to each item of evidence." *Great Coastal Express, Inc. v. Schruefer,* 34 Md.App. 706, 725, 369 A.2d 118 (1977) (citations omitted). *Accord Edsall v. Huffaker,* 159 Md.App. 337, 342, 859 A.2d 274 (2004).

Walker refers to *Maranto v. Maranto,* 192 Md. 214, 218, 64 A.2d 144 (1949), in which the Court of Appeals said that "an expert witness cannot usurp the function of the courts to determine the legal sufficiency of evidence of mental incapacity." In *Maranto,* an appeal from a divorce, the husband argued that the wife's allegations demanded greater corroboration because a psychiatrist had testified that she was "a paranoiac, and it is usual for a paranoiac to exaggerate." *Id.* at 217, 64 A.2d 144. The Court noted that the psychiatrist, after having interviewed the wife, testified to his "general impression," but could not recount any specific information about her. *Id.* at 217–18, 64 A.2d 144. Nevertheless, he

testified that she had a propensity to exaggerate and that she had exaggerated on the witness stand. The Court stated that, "[i]f a psychiatrist is to take over the function of courts and juries to pass upon the credibility of witnesses, he must furnish some basis for so doing more substantial than a general impression from forgotten facts." *Id.* at 218, 64 A.2d 144.

Walker also directs us to *Montgomery County Dept. of Social Servs. v. Sanders*, 38 Md.App. 406, 423, 381 A.2d 1154 (1977) (citations omitted), a child custody case in which we stated:

> Evidence offered by social workers, psychologists and psychiatrists may be necessary in custody cases. The equity court, however, is entitled to weigh that evidence along with contradictory testimony and its own observations. Reliance upon "the auxiliary services of psychiatrists, psychologists, and trained social workers . . . should not be too obsequious or routine or the experts too casual." Such reliance could lead the courts, in acts of misapplied psychology, to separate unjustly family members.

> "Particularly important is this caution where one or both parties may not have the means to retain their own experts and where publicly compensated experts or experts compensated by only one side have uncurbed leave to express opinions which may be subjective or are not narrowly controlled by the underlying facts."

We held that the trial court had not abused its discretion in returning the child to his mother's custody despite the testimony of the Department's expert that he should remain in foster care because of his age and the amount of time he had been away from his mother. We rejected the Department's contention that the trial court should have accepted the expert's opinion and ruled accordingly.

In our view, those cases are not controlling. Kaufman did not opine on the credibility of a witness or the legal significance of the evidence before the court. Because the

evidence included Grow's financial statement and his tax returns, it was certainly appropriate for the court to consider Kaufman's testimony on the issue in verifying Grow's income. As the trier of fact, the court was free to "believe or disbelieve, accredit or disregard" any or all of Kaufman's testimony, and we will not second-guess the weight it gave her testimony, or any other evidence. *Great Coastal Express,* 34 Md.App. at 725, 369 A.2d 118.

### 2. Pass–Through Income and Distributions

According to Walker, "it is obviously unjust to allow a parent to reap the many tax benefits of small business ownership while apparently minimizing his or her personal income and the support obligations that flow from it by leaving income in a privately held business." Presumably, she is referring to Aliron's retained earnings, and arguing that some portion of it should have been attributed to Grow as income. More directly, she contends that "Appellee's most recent tax returns made it clear that he had received a sizeable distribution from his company, that he did so on a regular basis," and that "these distributions should properly have been included by the chancellor in calculating Appellee's income."

■■■■ A "Subchapter S corporation" or "S corporation" is a company that is able, under federal tax law, to "enjoy the benefits of incorporation but avoid the taxation of both the corporate entity and its shareholders." *Attorney Grievance Comm'n v. O'Toole,* 379 Md. 595, 605, 843 A.2d 50 (2004) (citing 26 U.S.C.A. §§ 1361–1379 (2003)). " '[The] corporation and its shareholders [are able] to avoid the double tax normally paid when a corporation distributes its earnings and profits as dividends.' " *O'Toole,* 379 Md. at 605, 843 A.2d 50 (quoting *Byrne v. Comm'r,* 361 F.2d 939, 942 (7th Cir.1966)). "Thus, with few exceptions, the corporation does not pay tax at the corporate level, but its earnings 'pass through' to the shareholders who must report profits or losses on their federal and

state individual income tax returns." *O'Toole*, 379 Md. at 605, 843 A.2d 50.

 Although the corporation may make actual distributions to its shareholders, the income reported on the shareholders' tax returns does not necessarily reflect what the individual actually receives. Rather, portions of the income are often retained by the corporation to pay taxes, operating expenses, and employee's salaries.

"Actual income," for the purposes of determining child support, is "income from any source." Fam. Law § 12–201(b)(1). "For income from self-employment, rent, royalties, proprietorship of a business, or joint ownership of a partnership or closely held corporation, 'actual income' means gross receipts minus ordinary and necessary expenses required to produce income." Fam. Law § 12–201(b)(2). " 'Ordinary and necessary expenses' does not include amounts allowable by the Internal Revenue Service for the accelerated component of depreciation expenses or investment tax credits or any other business expenses determined by the court to be inappropriate for determining actual income for purposes of calculating child support." Fam. Law § 12–201(i). " 'Actual income' includes: (i) salaries; (ii) wages;" and "(v) dividend income." Fam. Law § 12–201(b)(3).

We have found no Maryland cases, and have been directed to none by counsel, addressing the extent to which pass-through income or distributions from a Subchapter S corporation should be considered the actual income of a parent for child support awards. Several courts in sister states have considered the issue. In interpreting their own child support guidelines, several states have determined that pass-through income should not be included unless the parent is using the corporate form to manipulate his or her income to avoid child support obligations. *See, e.g., Tebbe v. Tebbe*, 815 N.E.2d 180, 184 (Ind.Ct.App.2004) (holding that "undisbursed pass-through income of a minority shareholder in an S-corporation should not be included in child support calculations unless the trial court finds that the corporation is being used to shield in-

come"); [2] *In re Marriage of Brand,* 273 Kan. 346, 44 P.3d 321, 327–28 (2002) (holding that the trial court did not err in excluding retained earnings from a parent's income because the other party had failed to demonstrate that the parent "manipulated corporate assets, decreased the amount of his salary to increase retained earnings, or acted in any way to shield income").[3]

---

2. Indiana Child Support Guideline 3.A.1. states:

For purposes of these Guidelines, "weekly gross income" is defined as actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon "in-kind" benefits. Weekly gross income of each parent includes income from any source, except as excluded below, and includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, workmen's compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, inheritance, prizes, and alimony or maintenance received from other marriages. Specifically excluded are benefits from means-tested public assistance programs, including, but not limited to Temporary Aid To Needy Families (TANF), Supplemental Security Income, and Food Stamps.

Indiana Child Support Guideline 3.A.2. states:

Weekly Gross Income from self-employment, operation of a business, rent, and royalties is defined as gross receipts minus ordinary and necessary expenses. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed to restrict the deductions to reasonable out-of-pocket expenditures necessary to produce income. These expenditures may include a reasonable yearly deduction for necessary capital expenditures. Weekly gross income from self-employment may differ from a determination of business income for tax purposes.

Expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business should be counted as income if they are significant and reduce personal living expenses. Such payments might include a company car, free housing, or reimbursed meals.

The self-employed shall be permitted to deduct that portion of their F.I.C.A. tax payment that exceeds the F.I.C.A. tax that would be paid by an employee earning the same Weekly Gross Income.

3. Kansas Child Support Guidelines § II. D. states: "The Domestic Gross Income for the wage earner is income from all sources, including that which is regularly or periodically received, excluding public assistance and child support received for other children in the residency of either parent...." Kansas Child Support Guidelines § II. E. states:

1. *Self-Employment Gross Income*

It is consistent with somewhat analogous Maryland case law to focus on whether the corporation is being used to shield income. *See Quinn v. Quinn,* 11 Md.App. 638, 648–650, 276 A.2d 425 (1971) (holding that retained earnings by a husband's corporation were appropriate under the circumstances and should not have been attributed to the husband as income that was available to pay alimony); *see also Wallace v. Wallace,* 46 Md.App. 213, 228, 416 A.2d 1317 (1980) (affirming the trial court's finding in an alimony case that a business owner's income was greater than reported, as evidenced by his cash withdrawals from his dental practice).

Courts have held also that distributions that are for the purpose of offsetting an S corporation shareholder's tax liability should not be considered income to the shareholder because such disbursements do not increase the shareholder's ability to pay child support. *See, e.g. Tebbe,* 815 N.E.2d at 184 (holding that "pass-through S-corporation income that is merely disbursed to offset pass-through shareholder tax liability, and which does not increase the shareholder's actual income, should not be included in child support calculations"); *Brand,* 44 P.3d at 328 (holding that the trial court did not err in excluding distributions from parent's income when "the amounts distributed ... were for the sole purpose of paying his share of the corporation's taxes and were not available to pay support").

---

Self–Employment Gross Income is income from self-employment and all other income including that which is regularly and periodically received from any source excluding public assistance and child support received for other children in the residency of either parent.
2. *Reasonable Business Expenses*
In cases of self-employed persons, Reasonable Business Expenses are those actual expenditures reasonably necessary for the production of income. Depreciation shall be included only if it is shown that it is reasonably necessary for production of income. Reasonable Business Expenses shall include the additional self-employment tax paid over and above the FICA rate.
3. *Domestic Gross Income—Self–Employed*
Domestic Gross Income for self-employed persons is self-employment gross income less Reasonable Business Expenses.

■ Therefore, we are persuaded that, in determining a parent's actual income for child support purposes, a trial court can consider whether subchapter S income shown on a parent's tax return was actually received by the parent as actual income, or constituted pass-through income not available for child support. Distributions from an S corporation that are used to fund ordinary and necessary business related investments are not required to be included in the computation of the parent's actual income.

■ Nevertheless, a court considering such issues must take special care to ensure that the parent is not utilizing the S corporation to manipulate his or her income to avoid child support obligations. An express finding that the parent is not using the corporation to shield income to avoid a child support obligation is appropriate and would certainly aid appellate review in the future. The burden is on the parent seeking to exclude pass-through income from actual income to persuade the court that the pass-through income is not available for child support purposes.

As to the pass-through income from Aliron that appeared on Grow's tax return, Kaufman testified that Grow, the minority shareholder, did not actually receive that money because it was retained by the company, or it was distributed to him for purposes of satisfying his personal tax liability on corporate earnings or for business investments, including Aliron's office building.

■ In response to appellant's argument that the distribution from Aliron and the interest on investments should have been included in the calculation of Grow's actual income, the court said: "See, that doesn't get me anywhere. . . . That's business. . . . I don't see that as being something I can turn into income[.]" Obviously, the circuit court considered the pass-through income and distributions to be in the nature of ordinary and necessary business expenses required to produce income, rather than a vehicle to manipulate or shield income to avoid child support obligations. We are not persuaded,

based on the evidence presented, that the court erred or abused its discretion in reaching that conclusion.

■ But, we hasten to add that such a determination would not be necessarily appropriate in all cases involving S corporations. In considering pass-through income, trial courts must ensure that the retained earnings and distributions are truly "ordinary and necessary expenses required to produce income"[4] and not income available to the parent. Fam. Law § 12–201(b)(2). Moreover, any amount that is actually received by the shareholder not used for such expenses should be included in the calculation of actual income. The fact that a party is a minority shareholder is certainly a factor to be considered by the court, but minority shareholder status, in and of itself, would not always be the determining factor. The nature of the business, the governing documents, and the business and non-business relationship among the shareholders would also have to be considered in evaluating the issue of control.

### B. Other Forms of Actual Income

### 1. Dividend Income and Interest Income

Walker argues that the circuit court erred in failing to consider Grow's " 'rolled over' gains on money market funds" as income. At trial, Grow testified as follows:

[WALKER'S COUNSEL]: Okay. You didn't indicate on your income statement any dividends, correct?

[GROW]: I did not consider dividends as a gross monthly wage.

---

4. In rejecting a parent's argument that retirement contributions may be deducted from the gross receipts of his business for purposes of calculating his actual income, we clarified that Fam. Law § 12–201(b)(2) contemplates only *"necessary* business expense[s]." *Cohen v. Cohen,* 162 Md.App. 599, 614, 875 A.2d 814 (2005). "Business expenses are expenses incurred to earn money, not sums that a person chooses to put aside from his/her gross income for retirement." *Id.* Fam. Law § 12–201(i) gives the trial court discretion to exclude "any other business expenses determined by the court to be inappropriate for determining actual income for purposes of calculating child support."

[WALKER'S COUNSEL]: All right, I didn't say it was. I'm saying in other gross income.

[GROW]: Oh, other gross income?

[WALKER'S COUNSEL]: Yes.

[GROW]: I didn't consider, well, the dividends I don't receive. The dividends are just accumulated in a money market fund. So I considered monies I received. I didn't receive dividends. Dividends are just rolled over in a money market, in a mutual fund.

[WALKER'S COUNSEL]: So would it be fair to say that there is income as to investments, as to, we'll start with investments. There's income as to investments but since you're rolling over, you're not counting it as other gross income, is that correct?

[GROW]: If it's a money market earning, for example, and there is gain that just remains in the mutual fund, and I don't receive that, I don't show that on my income statement.

[WALKER'S COUNSEL]: Is the mutual fund in your name?

[GROW]: It's in my name.

Walker also makes reference to "taxable interest of $1851, tax-exempt interest of $8429, and dividends of $1707," which appear on Grow's 2003 personal income tax return.

■■■ " 'Actual income' means income from any source," Fam. Law § 12–201(b)(1), including "dividend income" and "interest income." Fam. Law § 12–201(b)(3)(v), (vii). It appears that perhaps all of the dividend income referred to by Walker was included in the circuit court's income calculation and that some of the tax-exempt interest was considered by the court as pass-through income. Grow acknowledges, however, that $2,165 of tax-exempt interest that should have been included was not. On remand, the court should ensure that all dividend income and interest income required by Fam. Law § 12–201(b)(3)(v) and (vii) is included in the calculation of Grow's actual income.

## 2. Expense Reimbursements or In–Kind Payments

Walker also argues that "[t]he value of [Grow's] health insurance and payment of his cell phone bill, both of which are provided by his company," should have been included in the calculation of Grow's actual income.

Under Fam. Law § 12–201(b)(3)(xvi), actual income includes "expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business to the extent the reimbursements or payments reduce the parent's personal living expenses." Grow testified at trial that Aliron provides his health insurance and pays for his cellular phone service. He argues that, in regard to the cell phone, "Walker offered no evidence and offered no testimony about an amount" to be added to his actual income and any finding by the circuit court would have been "entirely speculative." Indeed, Walker merely elicited testimony from Grow that Aliron pays for his cell phone service.

Grow, on the other hand, once the existence of the payments came into evidence, presented no argument why these in-kind payments should not be included as part of his actual income. He contends, instead, that the analysis of personal use vis-a-vis the business use of the provided service would defeat the legislative intent of the guidelines of limiting the role of the trial court in deciding the specific amount of child support to be awarded by limiting the factual findings necessary under pre-guideline cases.

The amount of actual income that drives the specific amount of the support award under the guidelines is a factual finding that is required in every case. "[E]xpense reimbursements or in-kind payments" received from an employer "that reduce the parent's personal living expenses" are required by statute to be included in the actual income calculation. Fam. Law 12–201(b)(3)(xvi). Sometimes that determination is an easy one, but not always. In either situation, it would seem that the analysis involving a cell phone would begin with the cost of the service. If a party contends that all

or some of that amount is to be excluded from his or her actual income, that party has the burden of persuasion in excluding it. Factors to be considered include the cost and scope of the service, the employer's policies regarding personal use, and whether the service substitutes for a personal cell phone or even replaces land line service.

Grow argues that the cost of quantifying the amount that in-kind cell phone payments would reduce his personal living expenses would not be justified based on the marginal impact on the child support award. He suggests that, if the guidelines were extrapolated in this case, the amount of additional child support would be $2.00 per month. Assuming that is, in fact, the case, we might not remand if that was the only issue to be considered on remand. At the same time, a similar argument might be made in regard to other expense reimbursements and in-kind payments, but, such payments, when they reduce personal living expenses, are statutorily required to be considered as actual income. Moreover, the parties themselves can always consider the cost-benefit ratio in their efforts to include or exclude an item in the actual income calculation.

As to the health insurance payments, Grow concedes that the circuit court did not include the health insurance payments made by Aliron in its actual income calculation, but contends any error was harmless. It was harmless, he contends, because the children are covered on the policy, so it would ultimately be subtracted from his actual income.

 In calculating a party's actual income, health insurance payments made by an employer are to be included "to the extent [the payments] reduce the parent's personal living expenses." Fam. Law § 12–201(b)(b)(3)(xvi). The court then determines "adjusted actual income" by subtracting "the actual cost of providing health insurance coverage for a child for whom the parents are jointly and severally responsible." Fam. Law § 12–201(c)(3). On remand, the court should consider the health insurance provided to Grow by Aliron in its

calculation of his actual income, but subtract "the actual cost of providing health insurance coverage" for the children.

### 3. Commissions

Next, Walker contends that a one-time "real estate management fee" in the amount of $9,000, which Grow received in 2004, should have been included in the calculation of his income.

 Family Law § 12–201(b)(3)(iii) states that actual income includes "commissions." It is immaterial whether this was a one-time fee, or represents a likely source of future income. In *Johnson*, we held that a father's $41,400 bonus must be included in the calculation of actual income:

> Because it is nearly always impossible to predict the amount of future bonuses, if we were to adopt appellant's position and hold that bonuses (already paid) should be disregarded when calculating child support when the amount of bonuses in future years cannot be predicted with reasonable certainty, we would not be giving effect to the language of FL § 12–201(c)(3)(iv) [which states that actual income includes "bonuses."] ... Appellant stresses the fact that he might not receive any bonus in 2003. This is, of course, possible. ... If his bonus is significantly less than $41,400 for 2003, he can petition the court for a child support modification.

*Johnson*, 152 Md.App. at 619–20, 833 A.2d 46. Thus, the amount of the fee Grow received for property management should have been included in the computation of his actual income.

### 4. Capital Gains

 Next, Walker points to "numerous instances of sales of securities, from which [Grow] presumably realized capital gains." Family Law § 12–201(b)(4)(ii) states: "Based on the circumstances of the case, the court *may* consider the following items as actual income: ... capital gains." (Emphasis added.) Here, there was not sufficient evidence introduced at

the trial whereby the court could have determined whether Grow received capital gains to be considered income, in the court's discretion, or the amount of any such gains. Under the circumstances, we cannot say that the court erred or abused its discretion in not considering them.

### 5. Unrealized Gains

██ Walker argues that the court should have also considered Grow's "growing list of appreciating assets ... and two instances where he refinanced real property or took proceeds from Appellant's mortgage." In *Barton v. Hirshberg,* 137 Md.App. 1, 20, 767 A.2d 874 (2001), we determined that "[t]he definition of actual income in Family Law section 12–201(c) contains numerous enumerated factors that constitute income, none of which includes unrealized gains or appreciation in asset value." The circuit court did not err or abuse its discretion in refusing to include appreciation in asset value in its computation of Grow's actual income.

## II. Additional Expenses

Walker argues that the costs of child care during the summer months and family therapy should have been included in the calculation of Grow's child support obligation. Grow responds that the only summer child care that is relevant is the children's visits to summer camps. With respect to the family therapy, he contends that it is not medically necessary.

Walker testified that the children have attended various summer camps in years past. In the summer of 2004, Noah attended basketball camp for one week and worked at the Montgomery County Department of Recreation for three weeks. The remainder of his summer was "unstructured time." She expressed a desire to send him to the "Cal Ripk[e]n Baseball Camp" the next summer. In the summer of 2004, Hope attended a horseback riding camp for less than a week. For the remainder of her summer she attended a day care center. Walker said she would like Hope to attend the camp again the next summer, but for a longer period of time.

She also stated that Hope would need to attend daycare again the next summer.

Grow points out that Walker testified that, beginning in the 2004–2005 school year, the children no longer required after school daycare. She also listed no daycare expenses on her financial statement.

We have held that, in actual guidelines cases, "discretionary activities such as camp, music lessons, tutoring, and gifted and talented programs" are not added to the child support obligation. *Horsley v. Radisi*, 132 Md.App. 1, 26, 750 A.2d 692 (2000). In an above guidelines case, however, the court may consider such activities in determining the proper amount of child support. Fam. Law § 12–204(d). See, *e.g., Freeman*, 149 Md.App. at 21–37, 814 A.2d 65 (holding that, in an above guidelines case, the child support obligation may be increased to ensure that the child enjoys a lifestyle commensurate with the parent's economic position).

With respect to child care expenses, such as day care, the court is required to add the cost of such expenses to the child support obligation if the expenses are "incurred on behalf of a child due to employment or job search of either parent." Fam. Law § 12–204(g)(1). In determining whether child care expenses must be included, the court considers "actual family experience, unless the court determines that the actual family experience is not in the best interest of the child." Fam. Law § 12–204(g)(2)(i).

It is unclear from the record whether the court gave proper consideration to discretionary activities by the children or child care expenses, and the relationship, if any, between the two. These issues should be revisited upon remand.

Walker also testified at trial that the parties had attended "family therapy," paid for by her, and that she intends to have the family in slightly more expensive therapy in the future. On her financial statement, she listed $141 per month as the cost for "Therapist/Counselor."

 The guidelines do not expressly require a court to include the cost of family therapy in the child support obligation. The court is required to include "[a]ny extraordinary medical expenses incurred on behalf of a child." Fam. Law § 12–204(h). In an above guidelines case, it is within the court's discretion to include the cost of family therapy. Fam. Law § 12–204(d). From our review of the record, it appears that the court did not specifically consider the cost of family therapy. On remand, the court should determine whether the therapy qualifies as an extraordinary medical expense, or whether the cost of therapy should otherwise be included in the child support obligation.

### III. Child Support in Relation to Father's Income

Walker argues that the circuit court erred in failing "to relate the [child support] figure at which it arrived to the needs of the children," and failing to ensure that the children enjoy a lifestyle commensurate with that of their father.

 "When the chancellor exercises discretion with respect to child support in an above Guidelines case, he or she 'must balance the interests and needs of the child with the parents' financial ability to meet those needs.'" Freeman, 149 Md.App. at 20, 814 A.2d 65 (quoting Unkle, 305 Md. at 597, 505 A.2d 849). We are mindful of "the foundational concept that child support should be in an amount consistent with the parents' standard of living," and that this concept "cuts across all economic lines, whether the parents are poor or wealthy." Freeman, 149 Md.App. at 20, 814 A.2d 65. "[T]he trial judge should examine the needs of the child in light of the parents' resources and determine the amount of support necessary to ensure that the child's standard of living does not suffer because of the parents' separation." Voishan, 327 Md. at 332, 609 A.2d 319. Indeed, "[a] child is entitled to a standard of living that corresponds to the economic position of the parents." Freeman, 149 Md.App. at 23, 814 A.2d 65.

Walker directs our attention to Grow's various expenditures, including "fine art," "international vacations," "maid service,"

"a Mercedes automobile," and "cosmetic surgery." The trial court recognized her position:

> I understand how Ms. Walker has viewed what Mr. Grow has[,] and the fact that he has some money. He has money to buy things.... [B]ut I think that the evidence doesn't break through to tell me that he has so much more that we should start looking at this other than [as] a guidelines case.

We cannot know what the children's lifestyle would be if Walker and Grow lived together. Still, the children's lifestyle should not suffer simply because they live separately.

We have said that "the trial court need not use a strict extrapolation method to determine support in an above Guidelines case. Rather, the court may employ any 'rational method that promotes the general objectives of the child support Guidelines and considers the particular facts of the case before it.'" *Malin*, 153 Md.App. at 410, 837 A.2d 178 (quoting *Anderson v. Anderson*, 117 Md.App. 474, 478 n. 1, 700 A.2d 844 (1997), *vacated on other grounds*, 349 Md. 294, 708 A.2d 296 (1998)). "[I]n above Guidelines cases, calling for the exercise of discretion, the rationale of the Guidelines still applies." *Malin*, 153 Md.App. at 410–11, 837 A.2d 178. We are not persuaded that a guidelines extrapolation as used by the court to determine child support in this case was necessarily an abuse of discretion. On the other hand, a proper consideration on remand of the aspects of child support discussed above may persuade the court that a simple guidelines extrapolation would not necessarily afford the children the standard of living to which they are entitled, based on the economic position of the parents.

### IV. Counsel Fees

Finally, Walker contends that the circuit court erred in failing to consider all of the statutory factors in deciding not to award counsel fees. Grow responds that, although the court did not specifically refer to the statutory factors, it made the necessary considerations.

 Pursuant to Fam. Law § 12–103(a), the trial court "may award to either party the costs and counsel fees that are just and proper under all the circumstances." Accordingly, "the trial court 'is vested with wide discretion' in deciding whether to award counsel fees and, if so, in what amount." *Malin*, 153 Md.App. at 435–36, 837 A.2d 178 (quoting *Dunlap v. Fiorenza*, 128 Md.App. 357, 374, 738 A.2d 312 (1999)).

Section 12–103(b) of Fam. Law provides: "Before a court may award costs and counsel fees under this section, the court shall consider: (1) the financial status of each party; (2) the needs of each party; and (3) whether there was substantial justification for bringing, maintaining, or defending the proceeding." Notwithstanding the language of Fam. Law § 12–103(b) requiring the court to consider the factors "[b]efore" it "may award costs and counsel fees," we have determined that the court must also consider the factors before it may *deny* counsel fees.

In *Kierein v. Kierein*, 115 Md.App. 448, 693 A.2d 1157 (1997), the wife argued that the trial court had erred in denying her request for counsel fees where the husband's income was nearly five times that of hers. We stated that "we recognize the discretion afforded trial courts in awarding counsel fees; we wish, however, to make it clear that '[i]n exercising his or her discretion, the trial judge must consider and balance the required considerations as articulated by the Legislature in § 12–103.'" *Id.* at 459, 693 A.2d 1157 (quoting *Lieberman v. Lieberman*, 81 Md.App. 575, 601, 568 A.2d 1157 (1990)). *See also Barton v. Hirshberg*, 137 Md.App. 1, 33, 767 A.2d 874 (2001). We concluded: "Considering their disparate incomes, we shall remand the case for the trial court to consider the factors in FL § 12–103 and articulate its basis for denying counsel fees." *Kierein*, 115 Md.App. at 459, 693 A.2d 1157.

Even though " 'the trial court does not have to recite any "magical" words,'" *Horsley*, 132 Md.App. at 31, 750 A.2d 692 (quoting *Beck v. Beck*, 112 Md.App. 197, 212, 684 A.2d 878 (1996)), it must be clear on appeal that the court considered

the statutory factors. *See Harbom v. Harbom*, 134 Md.App. 430, 464, 760 A.2d 272 (2000). The only way we can determine whether the court considered the statutorily mandated factors is by reviewing the court's statements on the record.

Although not specifically related to counsel fees, the court made several statements that might be interpreted as considerations of the applicable factors to be considered in awarding counsel fees under Fam. Law. § 12–103. As to the justification of the proceeding, the court said that it did not "fault" Grow for defending against Walker's claims, and that it did not "fault" Walker for bringing them.

Nevertheless, it is not clear that the court properly considered Walker's claim for counsel fees. Specifically, the record does not indicate that the court gave consideration to the financial disparity between the parties and their respective incomes and needs. On remand the court should consider Walker's request for counsel fees, giving full and proper consideration to all of the factors mandated by Fam. Law § 12–103(b).

We shall vacate the court's judgment and remand this case to the circuit court for a determination of Grow's support obligation based on "actual income" pursuant to Fam. Law § 12–201(b), and whether attorney's fees are warranted based on the factors set forth in Fam. Law § 12–103(b).

**JUDGMENT VACATED AND CASE REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ½ BY APPELLANT AND ½ BY APPELLEE.**