Panel: Meredith, Arthur, Leahy, JJ.
Leahy, J.
*401 Antonio Ruiz ("Appellant") and Yuko Kinoshita ("Appellee") were married in 2004. They have two children. Yuko filed the underlying divorce in the Circuit Court for Montgomery County in 2016.[1] The court bifurcated proceedings into two "stages": (1) "custody" and (2) "remaining issues." In a series of orders entered between August and December 2016, the court enforced a post-nuptial agreement and the transfer of a condominium property to Yuko pursuant thereto; ratified a consent order the parties reached as to custody and access; and awarded Yuko $1,540 per month in child support, including costs related to the children's private schooling, plus a portion of the costs of therapy and childcare. Over three months later, on March 8, 2017, the court entered a final judgment incorporating these orders and granting the parties an absolute divorce.
On April 3, 2017, Antonio filed an appeal to this Court from the circuit court's final order. He challenges the circuit court's enforcement of the post-nuptial agreement, four of the court's decisions relating to its child support order, and the court's denial of his request for attorneys' fees.[2] In her response brief, *402 Yuko moves this Court to dismiss as untimely Antonio's appeal from the circuit court's 2016 orders.
We affirm the trial court on all issues raised on appeal by Antonio and deny Yuko's motion to dismiss. There was no final judgment that disposed of all the parties' remaining claims in the underlying divorce proceeding from which Antonio was required to appeal within 30 days until the court entered the Judgment of Absolute Divorce on March 8, 2017.
BACKGROUND
A. Initial Filings
The parties have two children, N.K., born in 2007, and M.K., born in 2009. After *52 living in Japan for several years, the parties separated in September 2015, within days of returning to the United States.
On April 4, 2016, Yuko filed for divorce. In her complaint, Yuko stated that she and the children had been living in their Maryland home since September 13, 2015, which is the same day she claimed Antonio "constructively deserted and abandoned [Yuko] and moved to the [D.C.] apartment jointly owned by [them]."
Yuko averred that on August 17, 2006, Antonio signed a "Post-Nuptial Agreement" ("Agreement") after she had discovered his adultery. Pursuant to the Agreement, Antonio must transfer the condominium in D.C. ("D.C. property") to Yuko "in the event of the parties' separation or termination of their marriage[.]" Yuko asked the court to (1) award her sole legal and physical custody of N.K. and M.K. pendente lite and permanently; (2) award her child support; (3) determine all property ownership, and award her title, use and possession of the family use property; (4) incorporate the Post-Nuptial Agreement into the divorce decree; and (5) award her attorneys' fees.
*403 A few days later, Yuko filed a financial statement, indicating tax-free[3] gross monthly earnings of $13,551.54, reduced to $12,428.52 in net monthly income after deducting for retirement.
The court entered a scheduling order on May 31, 2016. The order divided the case into two stages: "Stage 1 (custody)," with a two-day hearing in November 2016; and "Stage 2 (remaining issues)," with a settlement/pretrial hearing set for February 2, 2017.
Antonio answered Yuko's complaint on June 15, 2016. He admitted that the parties signed the Post-Nuptial Agreement; however, he declared that the Agreement entitled him to compensation for his 27% interest in the D.C. property. As to Yuko's request for child support, Antonio denied that she could not support the children without his help. Because the parties' combined income put them above the child support guidelines, Antonio asked the court to consider that Yuko's income is tax-free and that she has significant savings. Antonio also sought attorneys' fees and costs.
A month later, on July 18, 2016, Antonio filed a counter-complaint requesting (1) an absolute divorce; (2) shared physical and legal custody of N.K. and M.K.; (3) determination of child support in accordance with the guidelines; (4) resolution of all property ownership regardless of title not subject to the Agreement; and (5) attorneys' fees and costs. Listing constructive desertion among his grounds for divorce, Antonio averred that in September 2015, Yuko asked him to leave the marital home and, after he did so, she and the children moved to their apartment in Maryland. He also asserted that he "is gainfully employed and is well able to contribute to the support of the Minor Child[ren.]"
Antonio filed his financial statement on September 9, 2016. He claimed gross monthly income of $9,439.73, which, after a *404 retirement contribution of $944 and taxes, resulted in a net monthly income of $6,417.33.
B. The Post-Nuptial Agreement
Two years into their marriage, on December 22, 2006, the parties entered into the Agreement to address the disposition of property should the parties separate or divorce or if one should die. In regard to "Separate Property," the parties agreed, *53 "[e]ach shall during his or her lifetime keep and retain sole ownership and control of his or her Separate Property[,]" and "[e]xcept as otherwise expressly provided[,] in the event of separation, divorce, or death, neither party shall have any rights in or claims to the Separate Property of the other." The parties addressed the D.C. property in subsection (2)(c) of the section titled "Separate Property":
Yuko and Antonio are purchasing real estate property [a condominium
located in Washington, D.C.]. The purchase price of the D.C. property is $585,000 in addition to the closing cost estimated at $15,000. Yuko is making a down payment of $150,000 in addition to $15,000 for the closing cost, totaling $165,000 in cash, borrowing $108,480 ... and taking out a joint mortgage loan for the remaining amount of $327,000. The closing for the purchase of the D.C. property is scheduled for September 12, 2006. Pursuant to the parties' September 12, 2006, agreement,[4 ]... Antonio acknowledges that upon settlement of the D.C. property, Yuko *405 will be the owner of seventy three percent (73%) of the D.C. property and he, hereby, agrees to ownership of the remaining twenty seven percent (27%) of the D.C. property and assumes responsibility for one-half of the joint mortgage loan amount of $327,000 for the duration of the loan. Antonio acknowledges that the entire amount of expenses of $273,480 incurred for the purchase of the D.C. property, ... are being paid by Yuko from her own and personal accounts.... Antonio will be responsible for paying monthly one half of the mortgage payment in addition to one half of the property taxes and one half of the condo maintenance fees. Finally, Antonio pledges that in the case of separation, dissolution of the marriage or death, the D.C. property will be transferred to and owned solely by Yuko.
(Emphasis added). Subsection (2)(e) noted that "if either makes a monetary or non-monetary contribution toward the purchase, improvement, maintenance or expenses of property titled to the other spouse, the contributing spouse's monetary and/or non-monetary contributions will not create any legal or equitable right in the other's separately titled property, nor change the classification of such property." And subsection (2)(f) clarified, "Joint use of Separate Property shall not give rise to joint ownership of such Separate Property[.]"
The parties further agreed to waive, release, and relinquish a right or claim in the other's Separate Property, including "any ownership claim to such property[ ]" and "the right to seek or obtain an equitable distribution or a monetary award," noting that this subsection constituted a complete defense to the other's claim in his or her Separate Property. As for any separate debts, the parties decided that each would remain individually liable for debt arising from Separate Property, and for attorneys' fees, each party would be responsible "for his or her legal fees in connection with this *54 Agreement[,]" except in certain cases, such as a material breach. The parties also included a merger clause, which stated the Agreement was their complete understanding, and a choice-of-law provision, *406 which instructed that D.C. law would govern the Agreement.
1. Motion to Enforce Post-Nuptial Agreement
The first motion in the case was filed by Yuko on May 27, 2016, seeking to enforce the Agreement and requesting attorneys' fees. Regarding the D.C. property, she referenced, and attached as an exhibit, a more recent letter that Antonio allegedly sent on March 9, 2015, "to ease any concerns about [the D.C. property's] ownership in the event of divorce or separation." Under such circumstances, the letter continued, Yuko would become the D.C. property's sole owner. She also included a letter that Antonio allegedly sent on August 17, 2006, which pre-dated the Agreement and stated, in part, that if the parties separated or ended their marriage, "ownership of the [D.C.] property will be transferred entirely to Ms. Yuko Kinoshita." Yuko alleged that, despite these letters and the terms of the Agreement, Antonio refused to deed the D.C. property to her. She sought attorneys' fees for his breach of the Agreement and compensation for expenses she incurred-such as condominium fees-resulting from Antonio's failure to transfer the D.C. property.
Antonio opposed Yuko's motion, arguing that she must compensate him for his 27% ownership interest in the D.C. property before he would sign a deed for the condominium over to her. He contended that this was intended by the Agreement, otherwise the provision delineating their separate percentage ownership would be superfluous. Further, Antonio maintained that D.C.'s adherence to the parol evidence rule prevented the court from considering the 2006 and 2015 letters that Yuko attached to her motion to enforce.
The circuit court, Judge Karla Smith presiding, held a hearing on Yuko's motion to enforce the Agreement on July 22, 2016. Yuko focused her argument on the 2006 and 2015 letters in which Antonio agreed to transfer the D.C. property to Yuko. She maintained that subsection (2)(c) was not superfluous because Antonio would be compensated for his 27% interest if the parties disposed of the property prior to separation, *407 divorce, or death. For his part, Antonio insisted that "nowhere does it say it should be transferred without any compensation or any consideration," and asserted that Yuko must compensate him for his 27% interest.
2. The Circuit Court's Ruling
On August 25, 2016, the circuit court issued an opinion on Yuko's motion to enforce the Agreement. The court cited to the Agreement's definition of "Separate Property," and the statements of ownership interests and transference to Yuko. After acknowledging that D.C. law governed the Agreement, the court observed:
[Yuko] argues that [Antonio] has failed to honor the agreement to sign over the property. [Antonio] argues that a condition precedent has not yet been met in order for the property to transfer based upon the intentions of the parties, specifically compensation for his ownership interest in the D.C. property. However, the asserted condition precedent is not evidenced in the writing or in any other evidence provided by the parties.
While [Antonio] points to the common sense of dividing the ownership of the property, there is no explicit, written direction on compensation for the transfer of the property. The division of the property is clearly determined by the amounts invested by each *55 party in purchasing the property. However, nothing is discussed with respect to divesting those interests. The only specific discussed is divesting [Antonio] of his interest in the case of separation and/or divorce. The parties may have "intended" compensation, but this intention was never put into writing.
(Emphasis added).
The court found the Agreement unambiguous and determined that the D.C. property was "legally [Yuko's] and has been since the parties' separation." The court also awarded attorneys' fees to Yuko because Antonio breached the Agreement by not signing over the D.C. property to Yuko. In her orders accompanying the opinion, the judge required that *408 Antonio transfer, without compensation, the D.C. property and pay attorneys' fees.[5]
Three weeks after the court's decision, Antonio moved to stay the court's order pending appeal, which the court granted summarily on September 23, 2016. In a handwritten note, however, the court ordered that Antonio pay half of the monthly costs of maintaining the D.C. property.
C. Custody Merits Hearing
On October 6, 2016, Yuko amended her complaint. She added several provisions clarifying recent events affecting the parties' legal claims. Referring to an agreement at the scheduling conference, Yuko claimed that Antonio had failed to pay the $2,000 per month pendente lite child support to which he had agreed so that she would not seek a pendente lite hearing.[6] She also informed the court that she paid off the loan on the D.C. property, as well as its carrying charges and other expenses, without any contribution from Antonio. She requested judgments against Antonio for contribution to those expenses and the pay-off of the mortgage.
1. The Parties' Consent Agreement, Stipulations and Testimony
The court, Judge Steven Salant presiding, convened the parties for a custody merits hearing on December 7, 2016. At the outset, the parties informed the court that they had reached an agreement as to custody and access.[7] Relevant to *409 this appeal, the parties agreed to use the shared child support guidelines even though Antonio would have N.K. and M.K. for less than 128 overnights per year. The parties also agreed "that the children will remain at private school unless both parents agree to remove them from that school, or from private school." Therefore, only child support remained at issue for the hearing.
Yuko explained that she sought retroactive child support payments-$2,000 per month since the parties' agreement at the scheduling conference, crediting Antonio with any payments made-as well as contributions to the condominium's costs per *56 the court's September 2016 order. She claimed that Antonio's payments were inconsistent and, when he did pay, he would send a lump sum for support and condominium fees, leaving it unclear what money was allocated to which obligation.
Yuko asked the court to include the cost of the children's private school tuition in the child support calculations, since the parties agreed under the custody and consent agreement that they continue in the schools in which they were enrolled. She also asked the court to include costs for the children's nanny, their health insurance, N.K.'s therapy, and camp.
The parties stipulated that Antonio earned $9,440 a month and that Yuko earned $15,197 a month tax-free.[8] Further, the parties agreed that private school tuition was $29,215 annually per child but cost only $14,607.50 total because the IMF offered an educational allowance of 75%. Although Antonio agreed that hot lunch at the school cost $1,175 per child per academic year, that tuition insurance cost $292.15 per child *410 per academic year, and N.K's therapy cost $160 per month out-of-pocket, he would not stipulate that he was responsible for these costs. The parties also could not agree to other miscellaneous costs, such as those for the nanny or summer camp.
Antonio highlighted that the parties' combined income qualified the case as "above-guidelines," giving the court broad discretion in calculating an award. He requested that the court consider that Yuko's income is tax-free and asked the court to "gross up" her income. He urged that the basic child support obligation was not the issue; instead, it was the additional expenses that he would have difficulty paying.
In regard to those expenses for which Antonio refused to assume responsibility, Yuko testified that she paid $150 per month, per child, for the children's health insurance, and another $160 per month out-of-pocket for the portion of N.K.'s weekly therapy sessions not covered by insurance. She testified that tuition insurance was necessary because she committed to paying tuition for the entire year. With respect to her options for childcare, she explained that because she had to work full-time in downtown Washington, D.C., it was difficult to return to Friendship Heights before 5:00 p.m. The nanny picked up the children four days a week at 3:15 p.m. and would either take them home or to extracurricular activities; however, because the nanny was unavailable on Fridays, Yuko utilized the school's afterschool program until 5:00 or 6:00 p.m., for a monthly cost of $198. Yuko claimed $1,600 per month for the nanny and stated that the nanny worked four to five hours a day, at a rate averaging $18 to $20 per hour, and that she paid the nanny's $8 parking fee each day. Yuko used the nanny during the twelve weeks of summer because the children's various summer camps ended at different times.[9]
*411 Antonio tried to defend his fluctuating child support payments-explaining that his finances shrank because he "was ordered by the Court to get an attorney" and because he felt pressured by Yuko and her lawyers to move from a one-bedroom to a *57 two-bedroom apartment, increasing his rent from $1,600 to $2,718. He disclosed that his Chase credit card balance was at $16,000 while his Visa credit card stood at $19,000.
On cross-examination, Antonio acknowledged that he made a voluntary thrift savings plan contribution of $435.68 every pay period. He admitted that either the nanny or Yuko takes the children to their activities and that he did not object to Yuko's use of a nanny. But he noted on redirect that, if he began work at 7:00 a.m., he could leave work between 3:00 and 4:00 p.m. and would be willing to take the children to their activities, although he has no car. Finally, as to private school, Antonio asserted that they agreed to "contribute to private school together for the first year ... [a]s fairly as possible[ ]" after their return from Japan.
2. The Court's Support Award
Judge Salant announced his decision the following day, December 8, 2016. First, the court addressed Antonio's arrears from the parties' pendente lite agreement, finding that from June 2016 through November 2016, he should have paid Yuko $12,000 in support. Noting the priority of child-support payments over other debts, the court attributed Antonio's prior payments of $11,500 toward child support, leaving no payments in satisfaction of the court's order that he pay condominium fees. The court ordered Antonio to pay $500 in child support arrearages.
Next, per the parties' financial statements and stipulations, the court determined that Yuko earned $15,197 per month, Antonio earned $9,400 per month, and that the parties' combined monthly income was $24,637-"certainly in the upper level range of income," and "on that basis many expenses that would not ordinarily be included to a family with lesser means are appropriate and reasonable for people within that income *412 level." The court determined, based on the worksheet and financial information in the record, that Antonio made 38.3% of the parties' shared income and, after adjusting for certain categories, determined that Antonio's total monthly expenses (including all his personal expenses) were $5,388, leaving him "about $1,973 available for the payment of support."
In applying an extrapolation of the child support guidelines, and giving Antonio credit for 128 overnights, the court ordered Antonio to pay $1,540 per month in support beginning on December 1, 2016 (clearly less than the $2,000 per month Antonio agreed to pay pendente lite ). To arrive at this number, the court determined that the cost of the children's health insurance was $150 monthly and private school tuition, hot lunch, and tuition refund insurance cost $1,480 monthly. The court also found that, given the parties' income, the $1,600 per month for the nanny was appropriate and also included $198 for afterschool care.
In addition to the base child support award, the court ruled that the unreimbursed $160 per month for N.K.'s therapy was an extraordinary expense, but because that rate was only "typical" and would not necessarily be the rate charged, the court ordered Antonio to pay 38% of "all non-reimbursed or non-covered medical, dental and mental health expenses incurred on behalf of the children." The court also ordered Antonino to pay, "as additional support," 38% of the cost of the children's summer camps. The court did, however, decide that the parties could select summer camps by mutual agreement rather than ordering Antonio to pay the $800 per month that Yuko sought. Further, the court ordered that Antonio be allowed to claim both children as dependents for tax *58 purposes. Finally, the court denied each party's request for attorneys' fees, finding that each had a substantial reason to litigate the case. The court entered the order on December 21, 2016.
3. Antonio's Motion for Reconsideration
On January 4, 2017, Antonio moved for reconsideration of the court's child support order, claiming he did "not have the financial wherewithal to continue to pay the exorbitant costs *413 associated with the children's private schooling, luxurious summer camps, and other such similar fees." He contended that the court calculated his net monthly income incorrectly and complained that the court did not include his monthly credit card minimum payments. Antonio alleged that, after his expenses and child support payments, he would only have $173.05 remaining for all other costs, including 38% of the children's camps and non-reimbursed medical costs and 50% of the condominium maintenance.
Yuko opposed, arguing that Antonio's rent and credit card payments should have no bearing on his support obligation and that the court correctly determined his child support obligation, which was $460 less than what Antonio had agreed to pay pendente lite . Yuko pointed out that she agreed to use the shared guidelines even though Antonio has the children for less than 128 overnights a year, and if the sole guidelines were used, his amount would be significantly higher. Judge Salant summarily denied Antonio's motion, entering his order on February 25, 2017.
The court entered judgment of absolute divorce on March 8, 2017. In the final judgment, the court ordered the following:
ORDERED, that [Yuko] be and is hereby granted an absolute divorce from [Antonio] based on a twelve (12) month separation; and it is further
ORDERED, that the terms of the Consent Custody Order entered January 20, 2017 be and are hereby ratified and affirmed as though fully set forth herein into this Judgment of Absolute Divorce; and it is further
ORDERED, that the terms of the Court's Support Order dated December 21, 2016 be and are hereby ratified and affirmed as though fully set forth herein into this Judgment of Absolute Divorce; and it is further
ORDERED, that the terms of the Post Nuptial Agreement dated December 22, 2006 be and are hereby incorporated but not merged as though fully set forth herein into this Judgment of Absolute Divorce and shall be shielded and not subject to Public Inspection; and it is further *414 ORDERED, that the terms of the Court's Orders regarding the Post Nuptial Agreement dated August 25, 2016, September 23, 2016, and October 19, 2016 be and are hereby ratified and affirmed as though fully set forth herein into this Judgment of Absolute Divorce; and it is further
ORDERED, that all issues arising from the marriage are resolved and this case is closed for statistical purposes.
(Docket entries omitted).
On April 3, 2017, Antonio filed a notice of appeal in which he stated that he was appealing "the rulings ... entered on August 25, 2016 and March 8, 2017[.]" A week later, he amended his appeal, in which he stated that he was appealing "from the rulings ... entered on August 25, 2016 and December 21, 2016." Yuko has moved to dismiss as untimely the issues in Antonio's appeal that pertain to the circuit court's August 25 and December 21 orders.
*59 We have rephrased and consolidated the issues that Antonio presents on appeal as follows:
1. Did the trial court err in its interpretation of the 2006 Post-Nuptial Agreement by ordering Antonio to transfer the D.C. property to Yuko without compensation?
2. In calculating child support, did the trial court abuse its discretion by:
(a) refusing to "gross up" Yuko's tax-free income?
(b) including educational costs without considering the factors set out in Witt v. Ristanio ?
3. In awarding costs additional to the child support award, did the trial court err in:
(a) including non-extraordinary medical costs?
(b) its calculation of work-related child care costs?
4. Did the Court abuse its discretion by failing to award Antonio attorneys' fees?
We include additional facts as necessary in the following discussion.
*415 DISCUSSION
I.
Motion to Dismiss Antonio's Appeal
Preliminarily, we consider Yuko's motion in which she asserts that we must dismiss Antonio's appeal-wholly or, at least, in part-as untimely. According to Yuko, the underlying orders emanate from the Circuit Court for Montgomery County, where it is custom to issue scheduling orders that divide family law cases into two distinct stages: "Child support and custody issues are dealt with first on the merits in Stage 1. After the merits child support and custody issues are resolved, Stage 2 sets out the merits proceedings for property, grounds for divorce and any other remaining issues." Yuko claims that the December 21 order deciding child support was a final order, which, pursuant to the Maryland Rules, Antonio had to appeal within 30 days unless a motion to revise was filed within 10 days to stay the order. Because Antonio filed his motion to revise the December 21 order 14 days later, on January 4, Yuko declares that we must dismiss his appeal of that order. Additionally, she submits that we may not consider Antonio's appeal of the August 25 order to enforce the Post-Nuptial Agreement because he did not note his appeal to that order until his amended notice of appeal on April 10, 2017, over 30 days after the final judgment of divorce was entered on March 8, 2017.
Antonio replies that he timely filed his appeal within 30 days of the judgment of divorce, which he contends is the operative judgment for appellate review purposes. He draws attention to the fact that the December 21 child support order was not a final judgment because it did not resolve all the parties' claims before the court. Likewise, he denies that his amended appeal was untimely, stating that it merely modified his timely filed appeal to clarify which orders were appealed, and thus, it is still within this Court's purview.
*416 A. Appeals from Bifurcated Proceedings
In civil trials, Maryland Rule 2-503(b) permits a circuit court, on its own initiative, to bifurcate claims into separate trials based on convenience or to avoid prejudice. See also St. Joseph Md. Ctr., Inc. v. Turnbull , 432 Md. 259, 268, 68 A.3d 823 (2013) (citing Myers v. Celotex Corp. , 88 Md. App. 442, 448-50, 594 A.2d 1248 (1991) (discussing the applicability of Rule 2-503(b) ). A circuit court may, for instance, bifurcate a trial to hear the issue of liability separately from the issue of damages.
*60 See, e.g. , Tierco Md., Inc. v. Williams , 381 Md. 378, 414 n.29, 849 A.2d 504 (2004). Or, more pertinent to the case before us, the circuit court may bifurcate a divorce proceeding to hear the issue of parentage separately from the issue of support. See, e.g. , Sieglein v. Schmidt , 224 Md. App. 222, 230, 120 A.3d 790 (2015).
Regardless of how the circuit court subdivides its proceedings, the final-judgment rule still governs the timeliness of the parties' appeals. According to Maryland Code (1957, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 12-301, "a party may appeal from a final judgment entered in a civil or criminal case by a circuit court." Judge Arthur has summarized the general test for finality in his book:
The Court of Appeals has frequently stated that the accepted test for finality is whether the court's ruling has the effect of putting the parties out of court and denying them the means of further prosecuting the case or the defense. See, e.g. , Houghton v. Cty. Comm'ers of Kent Cty. (Houghton II ), 307 Md. 216, 221 [513 A.2d 291] (1986). According to the Court: "To have the attribute of finality, the ruling must be so final as either to determine and conclude the rights involved or to deny the appellant the means of further prosecuting or defending his or her rights and interests in the subject matter of the proceeding." [ Rohrbeck v. Rohrbeck , 318 Md. 28, 41, 566 A.2d 767 (1989) ] (italic removed). A ruling is final if it is "unqualified" and if "nothing in the trial court's action suggested any contemplation *417 that a further order be issued or that anything more be done." Doehring v. Wagner , 311 Md. 272, 275 [533 A.2d 1300] (1987) ; see Miller and Smith at Quercus [, LLC v. Casey PMN, LLC , 412 Md. 230, 243, 987 A.2d 1 (2010) ].
If the record suggests that it remains for the trial court to take some action to dispose of the case, an order is not final....
Judge Kevin F. Arthur, FINALITY OF JUDGMENTS AND OTHER APPELLATE TRIGGER ISSUES 5 (3d ed. 2018) ("FINALITY OF JUDGMENTS"). "[T]o be a final judgment in a controversy involving multiple claims, the order must dispose of all claims in the action." Schuele v. Case Handyman & Remodeling Servs., LLC , 412 Md. 555, 565-66, 989 A.2d 210 (2010) ; see also Anderson v. Anderson , 349 Md. 294, 297-98, 708 A.2d 296 (1998) (dismissing an appeal because, although the trial court had decided the central legal issue concerning child support, it had remanded the case to a special master to prepare a child-support worksheet, and, therefore, the trial court anticipated further findings of fact before entering a final judgment).
There exist three limited exceptions to the final-judgment rule. "Those three exceptions are: appeals from interlocutory orders specifically allowed by statute;[10 ] immediate appeals permitted under Rule 2-602;[11 ] and appeals from interlocutory rulings allowed under the common law collateral order doctrine." FINALITY OF JUDGMENTS, at 47 (citing *61 Wash. Suburban Sanitary Comm'n v. Bowen , 410 Md. 287, 295, 978 A.2d 678 (2009) ). *418 Applying the final-judgment rule in bifurcated circuit court proceedings, we can assume that unless one of the limited exceptions apply, an aggrieved litigant may not appeal until the circuit court enters a judgment that puts the parties out of court and "dispose[s] of all claims in the action." Schuele , 412 Md. at 565-66, 989 A.2d 210. Thus, when a circuit court bifurcates liability and damages, the court's order on liability is not final for purposes of CJP § 12-301 until it decides damages. See Hansen v. Kaplan , 47 Md. App. 32, 34 n.1, 421 A.2d 113 (1980). Likewise, in the divorce and custody context, this Court has held that a "circuit court's rulings regarding legal parentage and the obligation to provide support were part-and-parcel with further action required in th[e] divorce and child support case." Sieglein , 224 Md. App. at 236, 120 A.3d 790. Accordingly, a circuit court's order determining parentage and support was not final until the court also determined the parties' rights and obligations regarding custody and divorce. Id. On the other hand, under FL § 8-213(b), if in an order of the circuit court grants a divorce, but reserves on determining marital property issues, the order is final and appealable, regardless of whether the trial court certifies the judgment on the divorce claim as final under Rule 2-602(b). See FINALITY OF JUDGMENTS, at 37 (citing Parker v. Robins , 68 Md. App. 597, 601-02, 514 A.2d 1237 (1986) ); but see Parker , 68 Md. App. at 602 n.8, 514 A.2d 1237 (noting that FL § 8-213(b) would not authorize an appeal if the trial court reserves on issues in addition to marital property).
Returning to the instant case, we conclude that the court's March 8, 2017, order was the final appealable judgment in the underlying divorce proceeding. In her complaint, Yuko sought custody, support, and an absolute or limited divorce, as well as other appropriate relief. Antonio's counter-complaint was a counter-check on the same issues identified in the complaint. The circuit court bifurcated the proceedings to hear the merits of custody first, followed by the "remaining issues," including divorce. Recognizing that remaining issues remained to be decided, Yuko amended her complaint on February 7, 2017, to request an absolute divorce and ask the court to *419 "incorporate the Consent Custody Order and Child Support Order and Judge Smith's three Orders into the parties' Judgment of Absolute Divorce[,]" and to "incorporate but not merge the parties' [Post-Nuptial Agreement]." A "Judgment of Absolute Divorce" was entered on March 8, in which the court granted Yuko an absolute divorce, ratified and affirmed the terms of the parties' consent custody order, ratified and affirmed its December 21 support order, incorporated the Post-Nuptial Agreement, and ratified and reaffirmed its three orders regarding the Post-Nuptial Agreement. Unlike all the previous orders, the judgment noted that it resolved "all issues arising from the marriage" and that the "case [wa]s closed for statistical purposes." Cf. Matter of Donald Edwin Williams Revocable Tr. , 234 Md. App. 472, 495-96, 172 A.3d 988 (2017) (noting, in the context of Md. Rule 2-503(a), the importance, for finality purposes, of whether the court intended to resolve the multiple actions before it in joint or separate judgments).
As the procedural history, the parties' conduct, and the terms of the court's orders make clear, only the March 8 judgment had the effect of putting the parties out of court and denying them the means of further prosecuting the case. The orders challenged by Yuko that determined child support and the parties' rights in the D.C.
*62 property were "part-and-parcel with the further action required in th[e] divorce ... case." Sieglein , 224 Md. App. at 236, 120 A.3d 790. Until the court resolved or disposed of all the parties' remaining claims in the divorce proceeding, "determin[ing] and conclud[ing] the rights involved," Rohrbeck , 318 Md. at 41, 566 A.2d 767, there was no final judgment under CJP § 12-301 from which Antonio was required to appeal within 30 days. See Schuele , 412 Md. at 565-66, 989 A.2d 210.
In the family law context, a custody order may qualify as an appealable interlocutory order under CJP § 12-303(3)(x),[12] when it operates to "[d]epriv[e] a parent, grandparent, *420 or natural guardian of the care and custody of his child, or changing the terms of such an order[.]" See Cabrera v. Mercado , 230 Md. App. 37, 70, 146 A.3d 567 (2016) (concluding that there was appellate jurisdiction pursuant to CJP § 12-303(3)(x) over Ms. Cabrera's interlocutory appeal filed within 30 days of a custody order that granted sole legal and primary residential custody of her child to Mr. Mercado). In the underlying case, however, the parties agreed to the terms of a consent order regarding custody at the December 8 hearing, which was later entered as a separate order on January 20, 2017. This consent order cannot qualify as an appealable interlocutory order. Cf. Globe Am. Cas. Co. v. Chung , 322 Md. 713, 717, 589 A.2d 956 (1991) ("Where a party consents to judgment in a case, the party ordinarily may not appeal and obtain review of an earlier adverse ruling in that case."). Therefore, the court's December 21 order cannot qualify as an exception to the final-judgment rule under CJP § 12-303(3)(x) because it determined only the issue of child support-not child custody-and left the ultimate issue of the parties' divorce unresolved.
We conclude that there was no final judgment in the underlying divorce proceeding from which Antonio was required to appeal within 30 days until the court entered the Judgment of Absolute Divorce on March 8, 2017. We also *421 determine that none of the preceding orders fit within one of the limited exceptions to the final-judgment rule. We observe, however, that "even where the law permits an interlocutory appeal, a party is not necessarily required to take an immediate appeal to obtain review of that interlocutory order.... An appeal from the final judgment at the end of the case allows review of all interlocutory orders previously entered in the case that have not been decided on the merits in a prior interlocutory appeal." FINALITY OF JUDGMENTS, at 49 (internal citations omitted). Accordingly, in a case in which custody is litigated (and not consented to by the parties), an aggrieved party may either appeal the interlocutory custody order immediately or wait until the case results in a final judgment and *63 appeal the custody order as part of the final decision.
B. Notices of Appeal
We similarly reject Yuko's contention that we cannot consider the court's August 25 order enforcing the Agreement because Antonio did not specifically note his appeal of that order until he filed his amended notice of appeal more than 30 days after the circuit court's judgment.
Rule 8-202(a) requires, with certain exceptions, that an aggrieved party file its notice of appeal in the circuit court "within 30 days after entry of the judgment or order from which the appeal is taken." As Judge Arthur explained in his book on finality, the notice of appeal from a final judgment "need not specify the orders from which the party wishes to appeal; it operates as an appeal of any order that is appealable at the time." FINALITY OF JUDGMENTS, at 17 (citing Edery v. Edery , 213 Md. App. 369, 377 n.7, 73 A.3d 1229 (2013) (other citations omitted) ). Our general approach, as delineated by the Court of Appeals, is to construe notices of appeal liberally and to deem any limiting language to be surplusage. B & K Rentals and Sales Co., Inc. v. Universal Leaf Tobacco Co. , 319 Md. 127, 133, 571 A.2d 1213 (1990). That is because "the purpose of a notice or order of appeal is not to designate or limit the issues on appeal[,]" which is instead a "function of *422 the information report ... the prehearing conference ... and the briefs." Id. at 133-34, 571 A.2d 1213.
Antonio filed his notice of appeal on April 3, 2017, within 30 days of the final judgment for absolute divorce. This notice "operate[d] as an appeal of any order that [wa]s appealable at the time." FINALITY OF JUDGMENTS, at 17. Any limiting language in his April 3 notice (or his amended notice on April 10) was "surplusage" and does not limit the issues he may present on appeal. B & K Rentals , 319 Md. at 133, 571 A.2d 1213.
II.
Interpretation of the Post-Nuptial Agreement
Turning to the merits of Antonio's appeal, he first contends that the circuit court erred by interpreting the Agreement to require him to transfer the D.C. property to Yuko without compensation. Antonio suggests that the circuit court's interpretation renders surplus the terms of the Agreement setting his ownership interest in the D.C. property at 27%. He asserts that his 27% interest is a "beneficial interest." And he likens the Agreement to one between co-tenants and argues that the language regarding transfer was solely so that Yuko could control the property upon a specified event, not to divest him of his interest. Antonio presses that the lack of a mechanism for compensation suggests poor drafting, not the parties' intent, and that Yuko's interpretation would give "her a blank check to claim [his] Separate Property at her choosing." Antonio contends that the Agreement is ambiguous and should be remanded so that the circuit court may take evidence beyond the four corners of the document.
Yuko asserts with equal vigor that the Agreement and accompanying exhibits clearly express the parties' intention to transfer the D.C. property to her upon separation or divorce, without compensation to Antonio, and she declares that the ownership percentages are not superfluous because they define what each party would have received had they sold the property while married. According to Yuko, the Agreement *423 makes clear that she financed all the acquisition costs and that Antonio would contribute only his share of the *64 ongoing expenses of living in the house-"essentially rent."
Under D.C. law,[13] a separation agreement is considered a contract and courts interpret such agreements according to principles of contract law. Duffy v. Duffy , 881 A.2d 630, 633 (D.C. 2005). D.C. applies the plain meaning of the written language-regardless of the intent of the parties at the time they entered the contract-unless the language is not susceptible to clear understanding or if there is fraud, duress, or mutual mistake. Sahrapour v. LesRon, LLC , 119 A.3d 704, 708 (D.C. 2015) ; Dyer v. Bilaal , 983 A.2d 349, 354-55 (D.C. 2009). "A contract ... is not ambiguous if 'the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.' " Sahrapour , 119 A.3d at 708 (quoting Joyner v. Estate of Johnson , 36 A.3d 851, 856 (D.C. 2012). Appellate courts in D.C. review a trial court's determinations regarding the ambiguity of a contract de novo . Dyer , 983 A.2d at 355.
Based on our independent review, we determine that the Agreement is unambiguous. It states, "Antonio acknowledges that the entire amount of expenses of $273,480 incurred for the purchase of the D.C. property ... are being paid by Yuko from her own and personal accounts." It then provides that Antonio agrees to pay half of the mortgage payments and half of the taxes and maintenance fees-not unreasonable conditions for the right to reside in the condominium. The Agreement states that "upon settlement of the D.C. property, Yuko will be the owner of seventy[-]three percent (73%) of the D.C. property and [Antonio], agrees to ownership of the remaining twenty[-]seven percent (27%) of the D.C. property[.]"
*424 At the end of the paragraph setting out the above provisions, the Agreement states, "Finally, Antonio pledges that in the case of separation, dissolution of the marriage or death, the D.C. property will be transferred to and owned solely by Yuko." This language is clear and unambiguous. It is also found verbatim in the 2006 letter from Antonio that was incorporated into the Agreement, and the additional letters from 2006 and 2015 state the same in principle. Therefore, even if we were to conclude that the language of the Agreement was ambiguous, the parol evidence that is in the record fully supports Yuko's interpretation of the Agreement rather than Antonio's. See, e.g. , Sutton v. Banner Life Ins. Co. , 686 A.2d 1045, 1049 (D.C. 1996) ("Essentially, the parol evidence rule excludes ... evidence of prior and contemporaneous agreements, unless the terms of the agreement are ambiguous.").
The Agreement provides no mechanism to calculate the value of Antonio's 27% ownership interest or to compensate him for that interest in the event the parties were to separate or dissolve the marriage. Had the parties remained together and decided to sell the condominium, Antonio would have retained his 27% of the sale's proceeds. But because the parties separated, and the court awarded Yuko an absolute divorce, under the contract as written, Antonio must transfer the D.C. property to Yuko without compensation.
We discern no ambiguity in the Agreement and affirm the trial court's ruling.
*65 III.
Calculation of Child Support Obligation
Antonio claims the circuit court abused its discretion in calculating his child support obligation by refusing to "gross up" Yuko's tax-free income, and by including the cost of the children's private school tuition and related educational expenses.
*425 Maryland Rule 8-131(c) guides our review of an action tried without a jury. We "review the case on both the law and the evidence [and] will not set aside the judgment of the trial court on the evidence unless clearly erroneous[.]" Md. Rule 8-131(c). We will also "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Id.
In an "above guidelines case," considered to be one in which the parties' combined adjusted income exceeds $15,000 per month-the highest level of income specified in the child support guidelines set out in FL § 12-204(e) -the trial court enjoys significant discretion in determining the amount of the basic child support award. See Karanikas v. Cartwright , 209 Md. App. 571, 596, 61 A.3d 69 (2013). "[T]he trial court need not use a strict extrapolation method to determine support[,]" but "may employ any 'rational method that promotes the general objectives of the child support Guidelines and considers the particular facts of the case before it.' " Malin v. Mininberg , 153 Md. App. 358, 410, 837 A.2d 178 (2003). We likewise review those determinations for abuse of discretion. Id. Additionally, FL § 12-204(i) provides the trial court discretion to award certain costs such as transportation and private schooling. See Drummond v. State to Use of Drummond , 350 Md. 502, 512, 714 A.2d 163 (1998). In exercising its discretion, however, the trial court "must balance the best interests and needs of the child with the parents' financial ability to meet those needs." Unkle v. Unkle, 305 Md. 587, 597, 505 A.2d 849 (1986). We have instructed that we will not disturb a "trial court's discretionary determination as to an appropriate award of child support absent legal error or abuse of discretion." Ware v. Ware, 131 Md. App. 207, 240, 748 A.2d 1031 (2000).
A. Calculation of Parties' Income
First, Antonio declares that the circuit court abused its discretion in refusing to "gross up" Yuko's income due to her tax-free status. According to his own calculations, Antonio suggests that Yuko's "grossed up" income would amount to 72.2% of the parties' combined net income instead of the 61.7%
*426 that the court found. He claims the court's reliance on Lemley v. Lemley , 102 Md. App. 266, 649 A.2d 1119 (1994), was misplaced because the Court in Lemley dealt with tax-free income from a disability pension not regular earnings, and because the payor spouse had tax-free income, not the payee spouse. As he sees it, the issue in this case is that the custodial spouse can afford a higher lifestyle than the payor spouse. Additionally, Antonio continues, the trial court here had more discretion than the court did in Lemley because this case, unlike Lemley , is an above guidelines case. He references Tannehill v. Tannehill , 88 Md. App. 4, 9 n.4, 591 A.2d 888 (1991), for the proposition that one spouse having tax-free income puts the parties on "an unlevel playing field[,]" even though this Court in Tannehill did not actually decide the "grossing up" issue.
Yuko avers that under Lemley , 102 Md. App. at 291-92, 649 A.2d 1119, the trial court cannot predicate child support on "grossed up" income without a finding of voluntary impoverishment, meaning that *66 the circuit court had no discretion to "gross up" her income.
The General Assembly designed Maryland's child support guidelines to calculate support so that a child can enjoy the same standard of living as if the parents had remained together. Voishan v. Palma , 327 Md. 318, 322, 609 A.2d 319 (1992). To that end, they are "based on specific descriptive and numeric criteria and result in a computation of the support obligation." Id. (internal quotation omitted). Thus, "the goals of equity and consistency in child support awards are best served by stripping the court of most discretion, thereby reducing the decision to a purely mathematical exercise in which support obligations and related expenses are allocated between the parents in proportion to their 'actual income.' " Lemley , 102 Md. App. at 291, 649 A.2d 1119 (citations omitted).
As told in Lemley, a practice had developed years ago in Montgomery County whereby, in calculating child support under the guidelines, a master would "bump up" or "gross-up" a party's tax-free income number to reflect the amount of *427 taxes that party would otherwise have to pay. 102 Md. App. at 289, 292, 649 A.2d 1119. In Mr. Lemley's case, his sole source of income was a tax-free disability pension of $1,961 per month. Id. at 289, 649 A.2d 1119. The parties stipulated to-and in turn, the court's child support award was based on-a grossed-up income figure of $2,500 per month. Id. This Court reversed and remanded for an award based on the actual dollar value of Mr. Lemley's disability pension. Id. at 292, 649 A.2d 1119. Judge Davis writing for this Court reflected that
[b]y 'grossing up' Mr. Lemley's tax-free pension, the Circuit Court of Montgomery County undoubtedly intended to place him on equal footing with the many parents who pay taxes on their income. In a broad sense, that strikes us as a reasonable approach. The devil, of course, is in the details, and wrestling with those details is a job best left to the legislature rather than the courts.
Id. Given the history of the guidelines and the detail with which they were drafted, the Court held that a trial court lacks discretion to adjust a party's income except as expressly allowed by statute. Lemley , 102 Md. App. at 291, 649 A.2d 1119. The Court recognized one such authorization which remains in effect today: Maryland Code (1984, 2012 Repl. Vol., 2018 Supp.), Family Law Article ("FL"), § 12-204(b), which permits a court, upon finding that a parent is voluntarily impoverished, to calculate child support "based on a determination of potential income." See also Lemley , 102 Md. App. at 290-91, 649 A.2d 1119. Only in such a case can the court base its support calculation on a party's potential income, which is "determined by the parent's employment potential and probable earnings level[.]" FL § 12-201(l ). Otherwise, the court must use the "actual income" of each parent as defined in FL § 12-201. The Court instructed that, "[t]here is nothing in the statute that expressly authorizes the upward adjustment of tax-free income."[14] Lemley , 102 Md. App. at 291, 649 A.2d 1119.
*428 Antonio's reference to Tannehill , which preceded Lemley , is misdirected. In that case, Ms. Tannehill was working as a registered nurse and Mr. Tannehill was unemployed but received disability and social *67 security benefits. 88 Md. App. at 9, 591 A.2d 888. This Court noted that Mr. Tannehill's income-his benefits-may be tax exempt, placing the parties on "an unlevel playing field." Id. at n.4. Despite any unfairness, however, we observed that the guidelines "do not provide for a grossing up of tax exempt income." Id.
Given the clear statutory language and this Court's incisive decision in Lemley , the circuit court had no discretion to "gross up" Yuko's income and, therefore, could not have abused its discretion by declining to do so.
B. Inclusion of Private Education Cost
Next, Antonio contends that the trial court erred by including in the child support calculations the cost of the children's private school tuition and other associated costs, including tuition insurance and hot lunches, without considering three of the factors delineated in Witt v. Ristaino , 118 Md. App. 155, 701 A.2d 1227 (1997). He claims that the record is devoid of pertinent evidence on the children's scholastic performance, family history, or a particular need. He adds that, although there is "sufficient evidence to address whether or not the parents have the ability to pay for the schooling, it is clear that [Antonio] does not[.]"
Yuko counters that the circuit court did not err because the parties' December 7 custody agreement stated that the children would continue in private school unless both parties decided otherwise. Moreover, she points out that the parties had previously agreed to share the tuition costs 'as fairly as possible' and that the children had attended private school since returning to the United States in September 2015. Yuko *429 posits that, even though the circuit court did not discuss the Witt factors explicitly, the court heard testimony on many of those factors, including history of private school attendance, stability for the children, and the parties' pre-divorce agreement to re-enroll the children in private school. And, she adds, the court correctly included tuition and other private school expenses in its award calculation because it determined that it was in the children's best interest.
The determination of a child support award is governed by FL § 12-204, which, among other things, specifies the expenses that shall or may be added to the basic support obligation, including expenses for private education:
(i) By agreement of the parties or by order of court, the following expenses incurred on behalf of a child may be divided between the parents in proportion to their adjusted actual incomes:
(1) any expenses for attending a special or private elementary or secondary school to meet the particular educational needs of the child[.]
FL 12-204(i)(1).
In Witt , this Court was tasked with interpreting the meaning of FL § 12-204(i)(1), specifically the phrase "particular educational needs of the child." 118 Md. App. at 157, 701 A.2d 1227. Given the ambiguity of the language and the absence of any legislative history, this Court looked to Maryland and out-of-state cases and concluded that, rather than a "hard and fast rule" as the appellant in that case advocated, a trial court should determine "whether to attend or remain in a special or private school is in a child's best interest and whether and how parents are required to contribute to that expense." Id. at 169, 701 A.2d 1227. The following non-exhaustive list of six factors is set out in the opinion for trial courts to consider when determining whether a child has a "particular educational need" in calculating child support for children attending a special *68 or private elementary or secondary school:
(1) "[T]he child's educational history," including how long the child has attended a school, the "need for stability *430 and continuity[,]" and the proportion of the parents' income the child would have received had the parents stayed together;
(2) "[T]he child's performance while in private school";
(3) The "family history" of attending a particular school, particularly if it is religiously affiliated;
(4) Whether the parents decided prior to the divorce to send the child to the private school;
(5) Other facts specific to the case that may impact the children's best interests;
(6) "[T]he parents' ability to pay[.]"
Id. at 169-71, 701 A.2d 1227 (citations omitted).
At the hearing in the underlying case, Yuko's counsel noted the parties' agreement to keep the children in private school as she was beginning to address the Witt factors, and the court pointed out that it was not necessary to review those factors in regard to their attending private school because the parties had already agreed to enroll the children in private school. Indeed, the parties consented that "unless both parties agree otherwise in writing, their children shall continue to attend private school." During voir dire examination, Antonio testified that he understood the terms of the parties' agreement, that he could comply with it, and that the agreement was in the best interests of the children.
Aside from the court's reliance on the parties' agreement, however, the record and the court's oral ruling indicate that the court considered the relevant Witt factors-even if it did not refer to them explicitly. See Durkee v. Durkee , 144 Md. App. 161, 185, 797 A.2d 94 (2002) (addressing trial court's failure to make an express finding of voluntary impoverishment and noting that "a trial court does not have to follow a script. Indeed, the judge is 'presumed to know the law, and is presumed to have performed his duties properly.' " (internal citations omitted) ); Kirsner v. Edelmann , 65 Md. App. 185, 196 n.9, 499 A.2d 1313 (1985) ("[A] judge is presumed to know the law, and thus is not required to set out in intimate detail *431 each and every step in his or her thought process."); but see Ley v. Forman , 144 Md. App. 658, 682, 800 A.2d 1 (2002) ("[O]ne of the factors that must be considered in determining whether a child has a particular educational need to attend a private school is the financial ability of the parents to pay for the education.").
As Antonio's briefing acknowledges implicitly, the court considered evidence concerning all three of the Witt factors that he claims the court ignored. The court heard testimony of N.K.'s prior attendance at the same private school before the family's temporary move to Japan. Yuko also testified that the parties agreed while they were still in Japan-prior to their separation-to enroll the children in that same private school when they returned to America. The court asked Yuko twice whether the hot lunch program was something N.K participated in in the past, and Yuko testified that it was and explained why.
The record belies Antonio's primary argument-that the court failed to consider his inability to pay. The court noted in its oral ruling that Yuko's employer pays for 75% of the cost of the private schooling, leaving only $14,607.50 annually for the parties to pay for the two children, including the cost for hot lunches and tuition *69 insurance, both of which the court found reasonable. Regarding hot lunches, the court found that "[f]or a family making $300,000 a year, providing a hot lunch to their children is not unreasonable and the parties can definitely afford it." For tuition insurance, the court noted the high cost of tuition and concluded, "for something that costs this much money, it seems imminently prudent to have some kind of insurance ... and it's a reasonable cost."
As we explained in Witt , the factors for the court to consider are a "a non-exhaustive list." 118 Md. App. at 169, 701 A.2d 1227. Our review of the record reveals that the court heard evidence and considered several relevant factors relating to the children's enrollment in private school-most notably the parents' consent agreement to continue with private school and their ability to pay. We discern no error in the *432 court's decision to include those costs in the child support calculus.
IV.
Additional Expenses
In addition to those expenses that, under FL § 12-204(i), the trial court has discretion to award, "[c]ertain child care expenses and extraordinary medical expenses incurred on behalf of a child must be added to a basic child support obligation." Drummond , 350 Md. at 512, 714 A.2d 163 (citing FL § 12-202(g)-(h) ). This Court has interpreted the mandatory language in these statutory provisions to "le[ave] no room for discretion" in the trial court's calculation, "even in an above-guidelines case[.]" Chimes v. Michael , 131 Md. App. 271, 292-94, 748 A.2d 1065 (2000) ("Child care expenses shall be ... determined by actual family experience.") (quoting a prior iteration of FL § 12-204(g) ). Accordingly, we review de novo a trial court's determinations under FL § 12-204(g) - (h).
A. Extraordinary Medical Costs
Antonio claims that the circuit court erred by requiring him to contribute toward the costs for N.K's therapy. According to Antonio, N.K.'s therapy is not an extraordinary medical expense under FL § 12-201 and should already be covered by his basic child support obligation. Yuko responds that N.K.'s therapy qualifies as an extraordinary medical expense. Given that the court found the health insurance reimbursement for this expense uncertain, Yuko posits that it was reasonable and within the court's discretion to decide it would be handled outside of the child support guidelines with Antonio covering 38% of any expense.
Maryland defines "extraordinary medical expenses" as follows:
(1) "Extraordinary medical expenses" means uninsured expenses over $100 for a single illness or condition.
(2) "Extraordinary medical expenses" includes uninsured , reasonable, and necessary costs for orthodontia, *433 dental treatment, asthma treatment, physical therapy, treatment for any chronic health problem, and professional counseling or psychiatric therapy for diagnosed mental disorders.
FL § 12-201(g) (emphasis added). And FL § 12-204(h)(2) instructs that "[a]ny extraordinary medical expenses incurred on behalf of a child shall be added to the basic child support obligation and shall be divided between the parents in proportion to their adjusted actual incomes."
Yuko testified that she pays $160 per month for the portion of N.K.'s out-of-network therapy that is not covered by insurance. She explained that 70% of the weekly sessions are covered by insurance *70 but that she must pay the remaining 30% out of pocket. Based on this evidence, the trial court ruled that the unreimbursed $160 per month was an extraordinary expense, while noting that, "[b]ecause the parties are above the guidelines, they are not limited to extraordinary medical expenses."
In Bare v. Bare , the main case on which Antonio relies, Mr. Bare appealed the trial court's order requiring him to pay "a one-half share of the [children's] 'uninsured medical bills[.]' " 192 Md. App. 307, 310, 994 A.2d 487 (2010). At trial, Mrs. Bare had conceded that some of these medical expenses "were 'standard garden variety' expenses that could not be classified as extraordinary[,]" but relied on the "routine practice in Cecil County for over 'twenty-five years' for the court to order the sharing of all medical expenses, regardless of whether they qualified as extraordinary." Id. We reversed, holding that the trial court "lacked authority to require Mr. Bare to pay for medical expenses that do not meet the definition of 'extraordinary[.]' " Id. at 317, 994 A.2d 487. We reasoned that "the court's overbroad award of all medical expenses, without regard to whether they are ordinary or extraordinary, effectively require[d] Mr. Bare to pay twice for ordinary medical expenses[,]" because the child support guidelines are "designed to cover typical costs of raising children, including ordinary medical expenses such as the medications and co-payments for which Mrs. Bare sought reimbursement." Id.
*434 Consequently, we remanded the case for the trial court to resolve which medical expenses were extraordinary. Id. at 319-20, 994 A.2d 487.
We also addressed extraordinary medical expenses in Walker v. Grow , 170 Md. App. 255, 907 A.2d 255 (2006). In Walker , the mother had "testified at trial that the parties had attended 'family therapy,' paid for by her, and that she intend[ed] to have the family in slightly more expensive therapy in the future." Id. at 288, 907 A.2d 255. She listed the cost of "Therapist/Counselor" at $141 per month. Id. We began by observing that, although "[t]he guidelines do not expressly require a court to include the cost of family therapy in the child support obligation[,]" the trial court is required to include the costs of extraordinary medical expenses. Id. at 289, 907 A.2d 255. In an above guideline case, we explained, "it is within the court's discretion to include the cost of family therapy[ ]" in its basic support calculation Id. (citing FL § 12-204(d) ). But because the trial court had not specifically considered whether the therapy was an ordinary medical expense to be awarded discretionarily in the basic support award, or an extraordinary medical expense that it must award under FL § 12-204(h), we remanded the case for the trial court to make that determination.
Unlike in Bare , the trial court's ruling in the underlying case does not require Antonio to pay twice for N.K.'s therapy. See 192 Md. App. at 317, 994 A.2d 487. The only medical expense that the trial court included in Antonio's $1,540 in monthly basic support payment was the $150 that Yuko pays to include the children on her health insurance plan. Yuko testified that the $160 per month to keep N.K. in therapy was additional to the basic cost of insuring the children. As such, Antonio's contribution toward the cost of insuring the children-covered by the basic support payment-would not assist in funding N.K.'s therapy. Based on this, the trial court treated the monthly cost of therapy as an extraordinary expense and did not include it in its basic support award. Instead it required Antonio to contribute 38% of any unreimbursed *435 therapy payments. Cf. Walker , 170 Md. App. at 289, 907 A.2d 255. *71 Antonio argues, however, that N.K.'s therapy cannot be an "extraordinary medical expense" because N.K.'s insurance covered 70% of the costs.[15] He would have us interpret FL § 12-201(g) to mean that any "reasonable[ ] and necessary costs" for the enumerated conditions that health insurance partially covers cannot be considered an extraordinary medical expense. Such a rigid definition of "uninsured" is inconsistent and would lead to untenable results-forcing one parent of an insured child to pay for all medical expenses that the insurance does not cover, so long as the insurance covers at least a portion of the cost. See, e.g. , Frankel v. Frankel , 165 Md. App. 553, 578-79, 886 A.2d 136 (2005) (reciting the trial court's findings regarding extraordinary medical expenses (primarily therapy), totaling $21,590 per year that would not be reimbursed by insurance). Such a ruling would run counter to "the conceptual underpinning" of the child support guidelines, which "is that a child should receive the same proportion of parental income, and thereby enjoy the standard of living, he or she would have experienced had the child's parents remained together." Voishan , 327 Md. at 322, 609 A.2d 319. Accordingly, we hold that the trial court was legally correct to include as an "extraordinary medical expense" the cost for N.K.'s therapy that is not covered by insurance. See FL § 12-204(g).
B. Calculation of Work-Related Childcare
Antonio challenges the circuit court's determination of the cost for the children's nanny in calculating its child support order. Using the highest weekly payment to a nanny *436 that Yuko provided, $342, and multiplying that by 52, Antonio calculates that-at most-the nanny could cost only $1,482 per month. He contends that Yuko must proffer evidence to support her figure of $1,600 or the court must otherwise compute it by averaging the costs for which she does provide evidence and multiplying that by 46 (Yuko's annual custodial weeks), which he calculates as totaling $1,219 per month.
Yuko counters that, through her testimony and the bank statements she provided, she demonstrated that the nanny costs on average $1,600, and that because the court credited her testimony, its finding should not be disturbed. Given the varying hours for which the children need a nanny, Yuko avers that her testimony established a weekly cost of $392 which, multiplied by 52 and then divided by 12, would average to $1,698.67 per month. Assuming that Antonio correctly subtracted six weeks, she states that the monthly cost is $1,502.67. Additionally, she reiterates that Antonio does not object to using a nanny and that the nanny takes the children to their extracurricular activities.
The guidelines provide for the inclusion of child care expenses and state, in pertinent part:
(1) ... [A]ctual child care expenses incurred on behalf of a child due to employment or job search of either parent shall be added to the basic obligation and shall be divided between the parents in proportion to their adjusted actual incomes.
*72 (2) Child care expenses shall be:
(i) determined by actual family experience, unless the court determines that the actual family experience is not in the best interest of the child[.]
FL § 12-204(g). The statute thus delineates a mechanism by which a court can award actual expenses for child care when they are tied to actual employment or the pursuit of such employment. Shenk v. Shenk , 159 Md. App. 548, 554-55, 860 A.2d 408 (2004) (iterating a definition of "actual" used in a previous version of this dictionary as "Something real, in *437 opposition to constructive or speculative"). The burden to prove these actual expenses is on the spouse seeking them. Id.
The evidence presented at the hearing below demonstrates that the child-care costs are the product of the parents working during certain times when the children are not in school. Yuko's work schedule does not allow her to pick up the children from school, and although Antonio gets off work earlier at 5:00 p.m., he does not have a car and cannot transport the children to their extracurricular activities. So, the nanny picks up the children from school four days per week and drives them to extracurricular activities, therapy, or to meet Antonio.
Yuko employs a nanny at a cost ranging from $18 to $20 per hour plus $8 per day for the nanny's parking. The time the nanny needs to spend with the children varies between the school-year and summer and also depends on the children's camp schedules. Yuko testified that employing a nanny costs $1,600 per month. Assumedly, this represented $20 per hour for 20 hours per week, four weeks per month. Although Yuko's calculation is at the high end of the range of payments (e.g., $20 per hour instead of $18), the trial court heard testimony that the cost varies greatly and the turnover in the position is high, and the $1,600 amount did not include the $8 in parking, which can amount to over $120 per month. Given this evidence, and the deference we provide to a trial court's credibility assessments, see Md. Rule 8-131(c), we cannot say that the trial court's calculation was erroneous.
V.
Attorneys' Fees
Finally, Antonio maintains that the circuit court abused its discretion when it denied his request for attorneys' fees. He believes that an award of fees was justified under FL § 12-103 given his financial status, especially as he is "the economically inferior spouse" with "a negative net worth of -$35,000[.]"
*438 Yuko counters that an award of attorneys' fees is within the court's discretion. Absent a showing of arbitrary action or a clearly incorrect decision, Yuko maintains that this court should not overturn the trial court's decision on attorneys' fees.
Under FL § 12-103(a)(1),
(a) The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:
(1) applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties[.]
In deciding whether to award attorneys' fees, the court is required to consider "the financial status of each party;" "the needs of each party; and" "whether there was substantial justification for bringing, maintaining, or defending the proceeding." FL § 12-103(b). So long as the parties were substantially justified in bringing, maintaining, or defending the proceeding, the trial court has significant *73 discretion in applying the factors set out in FL § 12-103(b) to "decid[e] whether to award counsel fees and, if so, in what amount." Malin v. Mininberg , 153 Md. App. 358, 435-36, 837 A.2d 178 (2003). Its failure to consider those factors, however, is legal error. Petrini v. Petrini , 336 Md. 453, 468, 648 A.2d 1016 (1994) (citation omitted).
In its ruling on the parties' dueling requests for attorneys' fees, the trial court explicitly applied the factors enumerated in FL § 12-103(b). The court began by noting the financial circumstances of each party, concluding that "[t]here [wa]s no doubt in this case that [Yuko] is financially much better off than [Antonio] not only on her income, but also on her assets." The court then stated as follows: "Each party had a substantial justification for bringing and defending this proceeding and ... my review of the financial circumstances of each party believes that a denial is appropriate." Given the attention this case required the court to pay to the parties' respective finances, we cannot say that the court failed to consider *439 Antonio's comparative ability to pay attorneys' fees. Furthermore, we discern no abuse of discretion in the court's ultimate decision to deny his request for attorneys' fees.
JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.

For the sake of clarity and meaning no disrespect, we will refer to the parties by their first names. See Karsenty v. Schoukroun , 406 Md. 469, 477, n.2, 959 A.2d 1147 (2008).

The issues as stated in Antonio's brief are:
I. Did the trial court err[ ] in its interpretation of the 2006 Post-Nuptial Agreement by transferring Appellant's Separate Property interest in certain real property to Appellee without compensation to Appellant?
II. Did the trial court abuse its discretion by failing to increase Appellee's income so as to account for her tax-free status as an employee of the International Monetary Fund?
III. Did the trial court abuse its discretion by including educational costs in the child support guidelines without considering the factors set forth in Witt v. Ristaino ?
IV. Did the trial court abuse its discretion by including non-extraordinary medical costs in its award of child support?
V. Did the trial court clearly err[ ] when it miscalculated the monthly cost of work related child care for the minor children? VI. Did the Court abuse its discretion by failing to make an award of attorney's fees when Appellee had in excess of $300,000 in assets and Appellant has a negative net worth of -$35,000?

As an employee of the International Monetary Fund ("IMF") and a Japanese national, Yuko's income is not taxed in the United States.

The parties' agreement on September 12, 2006-attached to the Agreement as Exhibit A-is Antonio's letter of acknowledgment dated September 1, 2006. In it, he consents to the 73/27 ownership percentages of the D.C. property and states:
"I[ ] acknowledge that I have not and will not make any contribution to lessen the initial costs incurred for the purchase of the D.C. property ... I consent to the monthly responsibility for one half of the mortgage payment in addition to one half of the property taxes and one half of the condo maintenance fees.
In the case of separation, dissolution of the marriage or death, I pledge that the aforementioned D.C. property will be transferred to and owned solely by [Yuko]."

For attorneys' fees, Yuko's counsel was to submit an affidavit regarding her charges. Counsel did so on August 31, 2016, claiming $2,323.68 in fees. The court entered a judgment for $1,750 in attorneys' fees against Antonio on October 19, 2016.

Yuko alleged that, despite paying in full in July and August, Antonio did not pay anything in June or November, and paid only $1,000 in September, $1,500 in October, and $1,000 on December 1.

The consent custody order, entered on January 20, 2017, delineated the children's custody and visitation schedule and stated that the children would remain in private school unless both parties agreed in writing. It provided for joint legal custody but specified that Yuko would have primary custody for 40 weeks during the school year, allowing Antonio access every other weekend from Friday after school to Monday morning. The order also addressed vacations, holidays, and school breaks.

Yuko's financial statement filed on September 9, 2016, listed assets totaling $665,029-including $300,000 in real estate and $353,029 in bank accounts-and zero liabilities. Antonio's financial statement of the same date reflected $29,000 in credit-card liabilities and only $3,100 in assets.

Yuko testified that she spent $2,700 to send the children to one camp for part of the summer in 2016; a second camp for $2,608; and although not included in her financial statement, a third camp for $1,000.

These statutory exceptions are found in CJP §§ 12-302, 12-303 and 12-304.

Rule 2-602(b) allows a circuit court to enter a final judgment in regard to a ruling that disposes of one or more (but fewer than all), of the claims against one or more (but fewer than all) of the parties in a case. "To effectuate the right of appeal, however, the court must expressly determine in a written order that 'there is no just reason to delay' the entry of final judgment." FINALITY OF JUDGMENTS, at 37.

CJP § 12-303 provides in relevant part:
A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:
(1) An order entered with regard to the possession of property with which the action is concerned or with reference to the receipt or charging of the income, interest, or dividends therefrom, or the refusal to modify, dissolve, or discharge such an order;
(2) An order granting or denying a motion to quash a writ of attachment; and
(3) An order :
(i) Granting or dissolving an injunction, but if the appeal is from an order granting an injunction, only if the appellant has first filed his answer in the cause;
* * *
(x) Depriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order[.]
(Emphasis added).

Maryland generally gives effect to a choice-of-law provision in the parties' contract and will apply the law of the jurisdiction that they chose, subject to certain exceptions inapplicable here. National Glass, Inc. v. J.C. Penney Properties, Inc. , 336 Md. 606, 610-11, 650 A.2d 246 (1994). Consequently, we will, as the circuit court did, interpret the Agreement according to D.C. law.

The statute defines "Adjusted actual income" as "actual income minus:
(1) preexisting reasonable child support obligations actually paid; and
(2) except as provided in § 12-204(a)(2) of this subtitle, alimony or maintenance obligations actually paid."
FL § 12-201(c) (emphasis added).

At oral argument before this Court, Antonio suggested, for the first time, that N.K.'s therapy could not be considered an extraordinary medical expense because her condition was undiagnosed. We will not consider this argument because Antonio did not preserve it and cannot raise it for the first time at such a late stage in proceedings. See Uninsured Employers' Fund v. Danner , 388 Md. 649, 664 n.15, 882 A.2d 271 (2005) (expressing that the Court need not address arguments raised on oral argument that were not briefed on appeal).